**Employment Practices Group**

*Defining employers' rights in the workplace*

January 28, 2007

Lauren Simon Irwin
Upton & Hatfield, LLP
10 Centre Street
P.O. Box 1090
Concord, NH 03302-1090

Re:   *Karen Cook v. CTC Communications Corp.*
      *Docket No. 1:06-cv-58*

Dear Lauren:

As counsel for Karen Cook, you have asked me to review file materials and provide you with my expert assessment of Karen Cook's wrongful discharge and retaliation complaint that is being litigated in federal court against her former employer, CTC Communications Corp. ("CTC" or the "company").[1]  Specifically, you asked me to examine and comment upon Karen's employment with CTC, the concerns that she had and that she expressed to members of the senior management team including her immediate supervisor and the President and Chief Executive Officer, the investigation that took place, her termination from employment, and the treatment of other employees in the company.

In the field of human resources and employment law, certain accepted standards are recognized in law or as "best practices" for the handling of employer-employee issues in all aspects of human resources, terminations, internal investigations, and allegations of employee misconduct.  Sources relied on to form opinions about action employers should take when faced with such issues include the following:  guidance and model policies promulgated by governmental agencies such as the Equal Employment Opportunity Commission ("EEOC") and state fair employment practices agencies; court decisions; legal analyses published in legal journals and discussed at continuing legal education

---

[1] The Complaint is in four (4) counts, and Karen alleges common law wrongful termination; violation of the Uniformed Services Employment and Reemployment Act of 1994 ("ERISA"); violation of the Fair Labor Standards Act ("FLSA"); and violation of the Family and Medical Leave Act ("FMLA").  Throughout this document, for ease of reference, I will refer to all persons by using their first name as opposed to "Mr." and "Ms."

CTC has since merged with Choice One Communications and, together, the companies acquired Conversent Communications.  The three (3) companies are now known as One Communications.  CTC Communications no longer exists, but I will continue to refer to CTC as the employer throughout this report.

courses and programs; and the sharing of practical approaches and strategies at professional conferences and continuing education courses for human resources professionals and employment attorneys. My evaluation of CTS's actions here is based on whether industry standards with respect to these practices, as articulated in the sources described above, have been adhered to and followed.

## Summary of Findings

After reviewing the file documents, I have reached several conclusions, which are preliminary in nature as I understand that discovery is ongoing. I reserve the right to supplement or amend my report and conclusions as additional materials become available.

It is undisputed that Karen Cook, as the Human Resources Manager for the Northern Region, was hired by CTC to handle a variety of Human Resources functions. Based on her knowledge and experience, as well as her passion for ensuring that employees are treated properly, Karen raised concerns about CTC's handling of many issues. She was concerned that employees' rights were being violated under the federal laws of USERRA and the FMLA, for example. She felt terminations were done incorrectly. She complained of state and federal wage and hour violations, including violations of the FLSA. She complained that employees were not given their final paychecks on time and that they were not given their accrued paid time off benefits either. In addition, some employees were misclassified as exempt, thus depriving them of overtime pay for hours worked in excess for forty (40) in a week, and Karen brought this to the company's attention. Karen complained about the problems with the timekeeping system that resulted in employees not getting accurate paychecks, not getting accurate commissions and not getting paychecks on time.

Karen raised these issues with several co-workers and management employees. She repeatedly complained to her direct supervisor, Vice President of Human Resources Tracy Bradstreet. She complained to the Payroll Specialist, Jawanna Benjamin. She spoke to her colleague Clint Milhomme, Compensation and Benefits Analyst. She eventually even contacted the President and Chief Executive Officer ("CEO") of the company, Ray Allieri, because no one was paying attention to her concerns, and the company's practices had legal implications and posed risks under state and federal law.[2]

Karen wanted CTC employees to be treated fairly and in accordance with the law -- she wanted to do the right thing. Naturally, and understandably, Karen became frustrated when the company just couldn't get it right. That is, despite her repeated complaints and bringing issues to Jawanna Benjamin's attention, for example, payroll problems still existed. Employees were not getting paid on time. Employees were not given notices of their rights under the laws of the Commonwealth of Massachusetts. The problems were repeated, and they were frequent.

---

[2] While Ray Allieri is still employed by CTC, his title now is President of Business Services at One Communications. *(Allieri depo., pp. 39-40)*

Karen's supervisor, Tracy Bradstreet, was upset and angry that Karen was insistent that the errors that were taking place within the Human Resources Department be corrected. Indeed, on the heels of Karen's complaints, she very directly opined to Ray Allieri that Karen should be terminated. She cited conflicts that Karen had with her, and she further claimed that Karen had conflicts with her colleagues in the Human Resources Department.

In response to Tracy's complaints about Karen, Ray then asked Senior Vice President and General Counsel, Jim Prenetta, to conduct a fact-finding inquiry or investigation into Karen's ability to get along with others. Jim's investigation was half-hearted. He did not interview all relevant witnesses. He did not ask the right questions. He did not even take into consideration that Karen had raised various complaints about legal compliance and other unlawful practices and procedures at the company. He was either unaware of the full extent of Karen's complaints, did not ask enough questions about them, or neglected to be concerned with them. In any event, following his investigation, he recommended to Ray Allieri that Karen be terminated.

Despite the several conversations and meetings that Ray had with Karen in which he does not dispute that Karen raised many issues that she genuinely and passionately felt were legally problematic for CTC, Ray made the ultimate decision to terminate Karen's employment. Indeed, the termination came only seven (7) days after Karen's three-page, detailed email to Ray outlining numerous problems ranging from 401(k) deposits, FSA deductions, wage garnishments, employees not receiving their proper pay, and so on. In that writing, Karen expressed her sense of frustration and her deep concern "that the company is in violation of various regulations and is exposed to potential liability and action at the hands of various governmental agencies."

For the company to terminate Karen and claim it was due to personality conflicts is contrary to sound employment practices and ignores the pertinent facts of which Ray Allieri and Jim Prenetta, to some extent, were well aware. The temporal sequence of events cannot be ignored. No one has doubted the good faith nature of Karen's concerns. No one has cited any agenda that Karen has other than looking out for the employee's best interests or, in Tracy Bradstreet's words, "going local."

The shoddy investigation, conducted by an untrained and unseasoned investigator, led CTC down the wrong road, which culminated in Karen's termination. Any investigation conducted by Jim Prenetta and under Ray Allieri's direction was doomed to fail since the company took no time or effort to engage in preventative measures to educate management personnel and other company executives about the employment laws, whistle-blower protection, retaliation, and the like. This lack of training and education demonstrates a callous disregard for employee rights. As a result of the company's ignorance, the company's sloppy investigation, and perhaps an improper motivation, Karen Cook was victimized and the company followed Tracy Bradstreet's and Jim Prenetta's recommendations, such that Karen was no longer a CTC employee.

## I.   PRELIMINARY INFORMATION

### A.   Karen's Employment Information

Karen Cook was hired by CTC on August 1, 2005 to be Regional Human Resources Manager for the Northern Region. She was based out of CTC's Bedford, New Hampshire office. She reported to Tracy Bradstreet, Vice President of Human Resources. Tracy worked in CTC's Waltham office.

A review of Karen's personnel file indicates little information. Specifically, Karen never received a performance appraisal nor is there any negative documentation in her file about her work performance. No job description is contained in the file. Further, there is no handbook acknowledgement form indicating Karen's receipt of any handbook that may have been in effect during her brief tenure with the company.

Karen only worked at CTC for a short period of time. She was involuntarily terminated on November 10, 2005, so her tenure with the company was only a few days over three (3) months.

### B.   An Overview of the Human Resources Department

At all relevant times, the corporate Human Resources Department in Waltham was comprised of Tracy Bradstreet, Clint Milhomme, Jawanna Benjamin, and three (3) contract employees (Andrea Soo, Donna Carnevale, and George Halverson). The Human Resources professionals reported to Jim Prenetta, Senior Vice President and General Counsel. Effective December 2004, however, they began reporting directly to Ray Allieri, President and CEO.

The following is a comprehensive listing of the Human Resources Department prior to and subsequent to the time of Karen Cook's employment with CTC:

| Name of employee | Date of Hire | Date of Termination | Title |
|---|---|---|---|
| Tracy Bradstreet | August 19, 2004 | November 25, 2005 | Vice President of Human Resources |
| Karen Cook | August 1, 2005 | November 10, 2005 | Regional Human Resources Manager for the Northern Region |
| Donna Carnevale | | December 2005 or January 2006 | Contractor |

4

| George Halverson | | January 30, 2006 | Contractor |
|---|---|---|---|
| Andrea Soo | | Early December 2005 | Contractor |
| Clint Milhomme | October 18, 1999 | April 2006 | Compensation and Benefits Analyst |
| Jawanna Benjamin | June 6, 2005 | | Contractor |
| | October 10, 2005 | January 30, 2006 | Payroll Specialist |
| Donna Heuchling | November 28, 2005 | Position ended October 2006 | Contractor; interim head of Human Resources |
| Sandy Crespi | Prior to 2003 | September 2004, she transferred to sales support function in | Former Vice President of Human Resources |
| Tina Freitas | | Approximately September 2005 | |

C. _Employee Handbook_

A factual dispute exists as to whether or not an employee handbook was actually in effect during Karen's employment. Karen states that the employee handbook was in draft form only, and no handbook was in effect because it was still being developed. *(Cook depo., p. 129)* According to Tracy Bradstreet, an employee handbook was in place when she arrived at the company in August of 2004. *(Bradstreet depo., p. 122)* Indeed, she signed a form entitled "Acknowledgement and Receipt of CTC Communications Policy and Procedures Manual," but the form is undated. The company was, however, making changes to it. *(Bradstreet depo., p. 123)* While Tracy believes the company continued to distribute handbooks to new employees, those employees were also told that the handbook was in the process of being revised. *(Bradstreet depo., p. 124)* Indeed, there were some policies in the handbook that were not in effect during Tracy's tenure. *(Bradstreet depo., p. 125)*

Jim Prenetta believes that the employee handbook was in effect during Karen's employment. *(Prenetta depo., p. 148)*

Ray Allieri testified that the Lightship employees did not have a handbook in effect during Karen's tenure. *(Allieri depo., p. 57)*

It is interesting that the CTC Communications Employee Handbook 2004 is devoid of reference to an open door policy or any other policy by which an employee can complain about matters with legal implications or public policy matters. The company does invite complaints about discrimination (Section 102) and sexual and unlawful harassment (Section 703), but it does not encourage complaints about other illegal or unethical workplace conduct.

> ### D.   *Documents Reviewed*

In the course of my assessment, I reviewed a number of documents that you provided to me, and they include the following:

- First Amended Complaint

- Answer to First Amended Complaint

- CTC Communications Employee Handbook 2004

- Defendant's Response to Plaintiff's First Set of Interrogatories

- Personnel file of Tracy Bradstreet

- Personnel file of Karen Cook

- Deposition transcripts of the following individuals:

  - James P. Prenetta, Jr. and attached Exhibits 1-3
  - Raymond C. Allieri and attached Exhibits 1
  - Donna A. Heuchling
  - Tracine Bradstreet and attached Exhibits 1-4
  - Kevin J. Conmy and attached Exhibit
  - Karen Cook and attached Exhibits 2-4
  - Daniel J. Desmond
  - Clint Milhomme
  - Jawanna Benjamin

- Email exchange between Jawanna Benjamin and CTC managers dated January 31, 2006

- August 25, 2005 unsigned letter to Lisa Mayo concerning FMLA and termination

- Various email communications produced by Karen Cook, through counsel, concerning feedback in September of 2006 on work performed

- Three (3) pages of handwritten notes dated Monday, September 26 by Karen Cook, Bates # 195-197

- Numerous documents produced by Tracy Bradstreet including her handwritten notes

- Various emails Bates #398-412

- Invoices from Tracy Bradstreet to CTC dated December 2, 2006 and December 20, 2006

## II.   FACTUAL BACKGROUND

Karen Cook had a number of concerns about how issues were handled within the Human Resources Department, including but not limited to the lawful termination of employees, the proper classification of employees under the FLSA, violations of state wage and hour laws, and the lack of proper policies and procedures.

The summary of facts described in this section is taken from the First Amended Complaint and Karen Cook's deposition, unless otherwise cited. A copy of the Complaint is appended hereto as Attachment A.

### A.   Karen's Concerns about Legal Compliance Issues

#### 1.   USERRA Issues

In August of 2005, shortly after Karen's hire, Terri Radford, a CTC manager from Buffalo, New York, called Karen to discuss her desire to terminate an employee, Craig Smith, who was on a military leave. Terri complained that Craig could not get up to speed and deliver due to his absence, and that caused her office's profits to be low. During that conversation, Terri mentioned no performance issues that existed with Craig. In response, Karen advised Terri that the employee could not be terminated because of the protections afford by the federal law USERRA, which is the Uniformed Services Employment and Reemployment Rights Act of 1994. Terri then advised Karen that Tracy Bradstreet had already authorized the termination.

Thereafter, Karen met with Tracy and reminded her about the legal protections the employee was entitled to under USERRA. According to Karen, Tracy was angry that Karen raised the issue, and she denied authorizing Craig's termination. Tracy then told Karen that she would research the issue, and Karen offered to assist by obtaining information from the United States Department of Labor's website.

Tracy then met with Karen and suggested that she speak to Terri Radford again because there was a performance-based reason for Craig's termination. Karen was surprised, and she advised Tracy that Terri had not previously mentioned performance when she first spoke about Craig's employment situation. Karen also expressed her belief that Terri was "back peddling" and perhaps setting up a pretext for Craig's termination that would be contrary to the law.

7

Karen then spoke with Terri again, and she confirmed that Craig was protected under USERRA. Terri mentioned that Tracy believed there were "loopholes" and advised her that Craig could be terminated if performance issues existed. Karen again reminded Terri that she (Terri) did not mention performance issues in their initial conversation, and she further suggested that the company hire a temporary employee to minimize loss of profits during Craig's absence.

Karen and Tracy spoke again about the issue sometime in September or October of 2005. Indeed, they had approximately three (3) to four (4) conversations pertaining to Craig Smith's situation. Tracy again expressed to Karen that, if an employee was a poor performer, he should not be allowed to return from military leave. Karen cautioned Tracy that Terri Radford had not previously mentioned poor performance. Tracy further suggested that Karen look for an excuse to terminate the employee when she asked Karen to inquire as to whether Craig volunteered or had been drafted for military leave.

Tracy Bradstreet does not dispute that she and Karen spoke about Craig Smith and USERRA. *(Bradstreet depo., pp. 172-84)*

### 2. Terminations

Karen had concerns about another termination issue in September of 2005. A manager from Springfield, Massachusetts, Kirk Jonah, contacted Karen and expressed his desire to terminate Joey Sutton, an employee who worked for him. Kirk stated that he heard rumors that Joey was working for another company. Karen offered to meet with Kirk and advised him that facts and not rumors should be the basis for a termination decision. Kirk then added that Joey had a performance issue. Karen made arrangements to visit Springfield the following day to review the issue with Kirk and review any documentation that existed. While Karen is not saying that the company acted unlawfully, Tracy authorized the termination over the telephone before Karen had an opportunity to participate in the process.

Joey Sutton contacted Karen the following morning because Kirk Jonah apparently suggested that he call Karen to inquire about the reason for his termination. Kirk apparently provided no reason to Joey for his termination. Joey expressed concern over allegations of wrongdoing that he heard about and, further, was dismayed that the matter had not been fully investigated.

Karen had concerns about the fact that Joey had not been given his final paycheck on the day of his termination nor was he given vacation pay or documentation regarding his right to apply for unemployment benefits. The company's omissions in these regards are contrary to Massachusetts law.

Tracy Bradstreet admits that Karen raised these concerns. *(Bradstreet depo., p. 240-41)*

A third potential termination issue arose in September of 2005, at which time Kevin Conmy, Vice President of Sales, contacted Karen about the termination of an employee. Karen suggested that it was a "best practice" approach to utilize corrective action rather than summarily terminating this employee. Kevin subsequently contacted Tracy about the situation, and Tracy authorized the termination. Because Karen was never apprised of any alleged wrongful conduct, she was concerned about potential liability. According to Karen, Tracy agreed that Kevin was probably fabricating reasons to terminate this employee, but Tracy was not concerned about any potential liability for the company.

A fourth termination issue arose in approximately September of 2005. Lisa Mayo, who worked in Vermont, had been out of work on an authorized Family and Medical Act ("FMLA") leave. Despite the fact that Karen was responsible for the territory where Lisa worked, Tracy advised Karen that she was going to handle the termination and, further, that she would be backdating the termination date to coincide with the end of the FMLA leave. Karen expressed that she was not comfortable with having a termination made retroactive, and Tracy then had Jawanna Benjamin, an independent contractor for CTC, sign the termination letter.

Jawanna admitted that she signed this termination letter, she had never signed one before, and it was very unusual. *(Benjamin depo., pp. 90, 93)* In fact, she was not even a CTC employee at the time but, rather, was a contractor. *(Benjamin depo., p. 90)* Jawanna was so concerned about being asked to sign the letter that she contacted Ray Allieri and expressed her concern. *(Benjamin depo., p. 90)* Ray never responded to her inquiry. *(Benjamin depo., pp. 91, 92)*

Clint Milhomme was aware of Karen's concerns with Lisa Mayo's termination. *(Milhomme depo., p. 35, 85)*

In her deposition, Tracy admitted that she backdated Lisa Mayo's termination letter by five (5) days because she was on vacation when the lapse of her FMLA occurred. *(Bradstreet depo., p. 242)* A copy of that letter is appended hereto as Attachment B. Apparently the company had a policy that, when FMLA lapsed, an employee could be terminated. *(Bradstreet depo., p. 242)*

Karen had an additional concern about Lisa Mayo's termination. She believes that Tracy coached managers to be dishonest about the timing of the company's hiring of Lisa Mayo's replacement. That is, Tracy wanted it to appear that Lisa's replacement was hired after Lisa Mayo's FMLA leave expired. Tracy urged the managers not to reveal the identity of the person who had been hired as Lisa's replacement, but instructed them to say that the replacement was hired as an interim replacement until such time as Lisa's FMLA leave was over.

### 3.    FSA Deductions

Tracy admits that Karen raised an issue about the FSA deductions for employees. (*Bradstreet depo., p. 212*) Tracy explained that Karen's concern was that employees had not seen a deduction from their paycheck and deductions should have occurred on a pre-tax basis within a certain window of the implementation of the program. (*Bradstreet depo., p. 212*) Tracy agreed this was a valid concern. (*Bradstreet depo., p. 212*)

Clint Milhomme confirms the problems in this area, which caused employees not to have proper deductions taken from their paychecks. (*Milhomme depo., pp. 115-16*) Employees were negatively impacted by the FSA deductions because their money was not being deducted on a pre-tax basis from their account, and they would be affected on a non-pre-tax basis because of no deduction from their paycheck. (*Milhomme depo., p. 140*) Clint explained that employees are still responsible for paying day care, for example, but the deduction is not taken out of the paycheck. (*Milhomme depo., p. 140*) Employees eventually have the deductions corrected, but the problem was that the money was not sent over to the FSA provider in a timely manner so the employees could have access to the funds at the appropriate time. (*Milhomme depo., p. 141*) This temporary lag was costly to the employee, and the employee had to lay out additional money because of the improper deductions from the paycheck. (*Milhomme depo., p. 142, 143*) Clint was also aware, and Karen had concerns with, the fact that employees' deductions were being "flipped, i.e. DEP FSA to Health FSA." (*Milhomme depo., p. 127*)

### 4.    401 (k) Problems

No doubt, Karen raised concerns about the 401(k) issue as employees had complained to her. (*Bradstreet depo., pp. 145-46*)

Clint Milhomme was well aware of the problems with the 401(k) issues and the transfer of assets from Lightship's provider to CTC's provider. (*Milhomme depo., p. 113*) Clint was also aware that deadlines were postponed numerous times, which contributed to the fact that certain contributions were affected on some employees and they were not deducted. (*Milhomme depo., p. 126*) Employees had legitimate concerns because the actual deadline date or dates that employees were told when their money was going to be brought over to the plan were postponed, and there is a fiduciary responsibility that governs this process; Karen was very concerned. (*Milhomme depo., p. 114*) Employees complained about losing money when they did not get the employer match but this eventually was rectified. (*Milhomme depo., p. 144*) However, at least one particular employee complained about the negative impact on him by not receiving the full match by the November 1 deadline, as the company promised. (*Milhomme depo., p. 144*)

Clint was also aware there was an error in the percent of an employer match that was deposited in an account for the Fidelity fund. (*Milhomme depo., pp. 128-29*) Even a month later, an employee wrote to Clint advising that the problem still had not been rectified, and Karen was very concerned about this missed deadline. (*Milhomme depo., p. 131*)

### 5.   COBRA

Tracy agrees that Karen may have complained about the fact that employees were not getting COBRA notices at the time of termination. (*Bradstreet depo., p. 226*)

### 6.   Various Payroll Practices

Karen had numerous concerns about the company's payroll practices.

Tracy confirmed that absolutely there were payroll issues for employees in connection with the Lightship merger. (*Bradstreet depo., pp. 149-50*) Jawanna Benjamin agreed that there were approximately twelve (12) to thirteen (13) employees who had real issues with payroll, and Jawanna understood Karen's frustration in this regard. *(Benjamin depo., p. 58)*

Clint Milhomme was aware of Karen's concerns because employees complained directly to her after they had been terminated, indicating that they had not received their paycheck at the termination or during the next payroll cycle. *(Milhomme depo., p. 32)* In addition, Clint was aware of present employees who raised concerns about not being paid or missing pay, and this was one of Karen's concerns. *(Milhomme depo., p. 109)* Jim Prenetta admits that, if employees were not getting the paychecks that were due them, this would present legal implications for the company. *(Prenetta depo., pp. 120-21)*

Jim Prenetta understood that employees had various issues with their payroll, including the fact that the wrong deductions were coming out. *(Prenetta depo., p. 181)*

Tracy was also aware that Karen raised a concern about the direct deposit for employees, and she agreed that this was a valid concern as well, if true. (*Bradstreet depo., pp. 212-13)*

Tracy confirmed that Karen complained about the problems with the timekeeping system that resulted in employees either not getting accurate paychecks, not getting accurate commissions or not getting paychecks on time. (*Bradstreet depo., pp. 61, 152*) Clint confirms the errors with eTIME that prevented employees from logging on and submitting their time sheets in order to be paid. *(Milhomme depo., pp. 113, 128)*

Indeed, Donna Heuchling began an audit in December of 2005 – after Karen was terminated -- of the payroll practices and processes, to ensure compliance with wage and hour laws. *(Heuchling depo., pp. 18, 19)* Ray Allieri had told her that the payroll and benefit issues were a concern to employees. *(Heuchling depo., p. 17)* During her audit, Donna discovered that several employees were not being paid overtime due to a system problem where employees were not properly able to enter their time. *(Heuchling depo., p. 24)* This was as a result of the eTIME system, and it needed immediately correction. *(Heuchling depo., p. 24)*

11

It is interesting that Donna uncovered problems with Jawanna Benjamin's work performance. When Jawanna worked at CTC, there was "just way too much that needed work and fixing." *(Heuchling depo., pp. 32, 35)* While she got the payroll out, the company was not able to respond to inquiries in a timely fashion. *(Heuchling depo., pp. 34, 35)* Since Jawanna's departure, Donna has received no complaints from employees about payroll. *(Heuchling depo., p. 40)* Joanna Tow replaced Jawanna, and payroll issues have been handled more efficiently and effectively since that time. *(Heuchling depo., p. 40)* Indeed, complaints from employees went "dramatically" down after Joanna Tow was hired, and employees were able to understand the eTIME system. *(Heuchling depo., p. 69)*

### 7.   FLSA Concerns

In addition to raising concerns about the termination or potential termination of CTC employees, Karen expressed concern to CTC officials that the company was misclassifying employees as exempt from the overtime requirements of the FLSA. In addition to her general concerns on this topic, Karen was concerned about Service Delivery Representatives and their classification. Karen took steps to review job descriptions and job responsibilities of employees in her area to determine how they were classified.

Actually Karen's first encounter with the classification issue arose at the time of the hiring of a clerical person in the accounting department named Heather McDarby, in August 2005. Karen was preparing her offer letter and the template she received was having Heather classified as exempt, yet Karen knew the position was, in fact, a non-exempt position. She raised the issue with Tracy. There were several conversations thereafter where Karen and Tracy discussed the classification of employees. A copy of an August 9, 2005 emails is appended as Attachment C.

In an email dated August 30, 2005 pertaining to Service Delivery Representatives, Tracy stated, "[Right] now they are exempt. [A]t some future point we need to complete an FLSA audit to assure ourselves they are properly classified. [T]hanks." See Attachment D.

Indeed, Jawanna Benjamin was aware in September 2005 that ten (10) to twelve (12) employees in the Bedford office were misclassified as exempt, and they should have been non-exempt. *(Benjamin depo., pp. 95-96)*

Karen did not feel comfortable violating the law by classifying employees as exempt when they were not. Indeed, the issue of classification of employees arose at a meeting of the Human Resources Department at which time it became known that Karen called the United States Department of Labor to gain support for her position about the proper classification of employees. *(Benjamin depo., pp. 97-98)* Tracy's tone and body language demonstrated to Jawanna that she was angry that Karen had contacted the DOL and was raising these issues. *(Benjamin depo., p. 98)* Tracy responded that, because CTC was in the middle of acquiring another company, they would not deal with this issue

12

at the time, and there was also an anticipated layoff of some of the employees. *(Benjamin depo., p. 97)*

In addition, Karen states that she specifically told Jawanna Benjamin that she contacted the Department of Labor specifically on two (2) occasions, and Jawanna responded, "Karen, why did you do that? Why did you do that?"

Indeed, Tracy Bradstreet confirms CTC's lack of compliance with the FLSA. She had concerns or suspicions that employees may have been misclassified dating back to November of 2004. *(Bradstreet depo., p. 85)* She had planned to do an FLSA audit on the entire company once the integration of Lightship was complete. *(Bradstreet depo., p. 83)* She particularly had "suspicions" about the classification of the field engineering group. *(Bradstreet depo., p. 83)* Specifically, Tracy had concerns about three (3) field service engineers who may have been misclassified, which meant they may not have been getting the overtime they deserved, and the issue concerned whether their job content was true engineering or field-service technician work. *(Bradstreet depo., pp. 87-88)*

Because the management team was engaged in a restructuring, however, the company determined that conducting an FLSA audit at the time was not necessary because jobs were either going to change or be eliminated within a month. *(Bradstreet depo., p. 86)* This audit then was "put on the back burner." *(Bradstreet depo., p. 91)* Nevertheless, Tracy admitted that if employees were non-exempt under the FLSA, or were misclassified as exempt, then they were not being properly paid. *(Bradstreet depo., p. 89)* Without question, this would be a violation of law.

Indeed, when Donna Heuchling came aboard in November of 2005, she was asked to conduct an audit to ensure, in part, that employees were classified correctly as exempt and non-exempt. *(Heuchling depo., p. 17)* Donna found that approximately ten (10) employees were incorrectly classified as exempt when they were truly non-exempt employees. *(Heuchling depo., p. 22)* Accordingly, this legal problem was never corrected during Karen's or Tracy's tenure.

### B.    *Karen's Complaints to Ray Allieri*

Because her direct superior, Tracy Bradstreet, was involved in or condoning the unlawful practices that Karen observed, Karen contacted the President and CEO, Ray Allieri.

#### 1.    *September 21, 2005*

Karen's first contact with Ray took place on September 21, 2005 by telephone. Indeed, Karen first called Ray, but he was not in, and his administrative assistant provided her with Ray's cell phone number. Karen had not previously met or spoken to Ray, and she indicated she was hesitant to call him.

According to notes maintained by Ray Allieri, Karen discussed with him the following concerns:

- Employees not getting proper COBRA notices. *(Allieri depo., pp. 49, 55)*

- Terminations taking place in the Commonwealth of Massachusetts and the fact that all terminated employees must receive all pay and instructions the same day. *(Allieri depo., pp. 49, 53)*

- Reconciliation of 401(k) – this is in relation to CTC's acquisition of Lightship, and the needed reconciliation of Lightship's 401(k) plan with CTC's existing 401(k) plan. Karen complained this was not being done on a timely basis. *(Allieri depo., pp. 49, 56)*

- Karen was concerned that the "sales support" organization closed down and she was not aware of it, but Tracy knew about it two (2) weeks ago. This was "inappropriate." *(Allieri depo., pp. 49, 56-57)*

- The absence of an employee handbook for Lightship employees. *(Allieri depo., pp. 49, 57)*

- An issue with short-term disability benefits that needed to be reconciled. *(Allieri depo., pp. 49, 58)*

- Joey Sutton issue. *(Allieri depo., p. 50)*

- Hostile work environment. *(Allieri depo., p. 50)*

(See Attachment E, Allieri Deposition Exhibit 1)

Karen was raising what she believed were legal issues. *(Allieri depo., pp. 52-53)* Karen believed these were "genuine issues." *(Allieri depo., p. 54)* As CEO, Ray was concerned about the issues and wanted to understand all of them. *(Allieri depo., p. 55)*

> 2.    *September 26, 2005*

That September 21 phone call was followed up by a meeting which took place on Monday, September 26, 2005. In advance of that meeting, Karen prepared notes, a copy of which are appended here as Attachment F. On that day, Ray traveled to Bedford, New Hampshire to meet with Karen and discuss the issues. Karen believes the meeting lasted for several hours. Ray took detailed notes of the meeting and, according to his documentation, the following topics were discussed:

- Terri Radford, AE and military leave "told to dig for performance issues." *(Allieri depo., p. 64)* Ray explained that Karen raised a problem with an employee going out on military leave and the company wanting to take adverse action against him *(Allieri depo., p. 67)* Karen expressed concerns about how it was handled, and was not willing to dig for performance issues *(Allieri depo., pp. 68-69)*

14

- "NH law in how to pay Jamie" *(Allieri depo., p. 65)* Karen expressed concern about the proposed payment of an employee named Jamie that she believed was not in compliance with New Hampshire law. Ultimately, Jamie was paid in accordance with what Karen believed was correct. *(Allieri depo., pp. 69-70)*

- "Background checks. We hire dirty backgrounds if manager thinks it's okay. Exposure for the company to ignore issues if they cause… and do the same thing." *(Allieri depo., p. 64)*

- "Tracy becomes attacking when confronted – argumentative and abrasive." *(Allieri depo., p. 64)*

- "Only time she'll [Tracy] will put in writing – when she knows she screwed up." *(Allieri depo., p. 65)*

- "Benefits. How long must an employee work to be benefits eligible. Vacation 20. Medical 25. Life/long term 30." *(Allieri depo., p. 65)* Ray explains that Karen raised the issue of how long employees needed to be working for the company to be eligible for benefits, and there was a difference between Lightship and CTC that needed to be resolved. *(Allieri depo., pp. 70, 71)*

- "Conspiratorial approach to get dirt." *(Allieri depo., p. 65)*

- **"Karen believes that [Tracy] will retaliate."** *(Allieri depo., p. 66)* (Emphasis added) Ray added that Karen told him in subsequent conversations that she thought "that Tracy would try to set her up to fail." *(Allieri depo., pp. 71, 72)*

- **"**Joey Sutton – was Jim included." Ray believes the Joey Sutton issue revolved around commission. *(Allieri depo., p. 74)*

- "Question – 401(k) resolved?" *(Allieri depo., p. 66)*   This surrounded the issue of whether or not the 401(k) had been properly integrated for the Lightship employees. (*(Allieri depo., p. 75)*

(Attachment E)

Ray was concerned about the issues Karen raised with him during this meeting. *(Allieri depo., p. 67)* Ray expressed, "the concerns that Karen was raising are valid concerns that any CEO, including me, would want to fully understand, and ensure that, that if there was a legal issue, that we were in compliance with the law." *(Allieri depo., p. 73)*

> 3.    *Ray Apprised Tracy Bradstreet of Karen's Concerns and Tracy's*
>        *Interest in Terminating Karen*

Following the September 21 and September 26 conversations, Ray approached Tracy about the issues that Karen raised. *(Allieri depo., p. 75, 76)* He indicated to Tracy that he had a conversation with Karen. *(Allieri depo., p. 76)*   Ray said that he did not tell Tracy that Karen was the specific source for each issue he raised with her. *(Allieri depo., p. 76)*

Tracy admits that Ray told her that he had spoken to Karen. *(Bradstreet depo., p. 205)* Karen reports that Tracy called her on September 28, 2005 and advised her that she knew that she (Karen) had spoken to Ray.

Subsequent to these conversations, Tracy approached Ray and expressed her belief that it was time to terminate Karen. *(Allieri depo., p. 77)* Tracy accused Karen of "[going] local," meaning that she was more concerned about representing the needs of the local employees rather than the corporation's needs. *(Allieri depo., p. 78)* In late September when Tracy contacted Ray to express her belief that Karen should be terminated, following the blow-up Karen and Tracy had about the company's non-compliance with USERRA, Ray was well aware of the many problems that Karen complained about in the human resources arena. *(Bradstreet depo., pp. 206-07)* When Tracy was asked, "but [Ray] did mention that [Karen] had cited a litany of problems in the Human Resources Department, Tracy answered, "Yeah, and, in fact, I don't even think he mentioned anything that was not legal." *(Bradstreet depo., p. 207)*

> 4.    *October 10, 2005*

Karen had not heard back from Ray following her September meeting, and she contacted him again sometime in early October of 2005.

Ray has notes from an October 10 conversation with Karen.  The notes read as follows:

- Things have heated up over the past two (2) days – hostile work environment.
- **Hostile intimidating environment**
- Tracy making accusations about Karen to Jawanna yesterday
- Tracy called Jawanna into her office. Clint told me that Jawanna told salary ranges.
- **Pitting folks against each other.**
- Clint and Karen are disgruntled. Very attacking.
- Things are heating up. Emails from Tracy to Karen speaking to conversations that did not happen. Recruiting.
- I think she (Tracy) is unstable.  Tracy is worried that Karen may be sharing things with me.  **The backlash is so severe that she is afraid to bring any issues forward.**  Indicated in staff meeting when issues brought forward.

*(Allieri depo., p. 112; Attachment E) (Emphasis supplied)*

16

Most significant is Karen's expression that she was getting severe backlash, was afraid to continue raising issues, and Tracy was trying to turn other Human Resources employees against Karen. *(Allieri depo., pp. 113-14)*

### 5. November 3, 2005 Complaint

On November 3, 2005, Karen sent Ray a detailed email reiterating some of her concerns (Attachment E). She advised him that, over the past few weeks, "employees have been repeatedly negatively impacted by payroll errors and various errors with Enterprise e-TIME." Karen said that she communicated these issues via email to Jawanna Benjamin and Tracy Bradstreet at the end of September, but received no response. She complained that the payroll issues have compounded, employee frustrations have escalated, and an FSA issue existed as well. Again, Karen advised that she sent emails to Jawanna and Tracy, but received no responses. Karen said she had re-forwarded those emails each week thereafter and explained additional issues that had accumulated. Due to the lack of response, employees were "extremely frustrated" and finding it "necessary to escalate upward once again" given the serious negative financial impact it has had on them. Karen was looking for these issues to be addressed as they were "in crisis."

Karen stated, "I'm sure you can understand the sense of frustration this causes for me. I very rarely have been in a position or felt I was in a position that I could not deliver on results. I'm very concerned about the fact that the company is in violation of various regulations and is exposed to potential liability and action at the hands of various governmental agencies."

Karen then elaborates, in two and one-half (2 ½) more pages of single spaced typing, by reiterating her concerns under the following headings:

- 401(k)
- FSA deductions
- Employee's deductions are being flipped, i.e. DEP FSA to Health FSA
- HSA deductions
- Deduction codes
- Employees not receiving pay
- Enterprise eTIME
- Wage garnishments.

Clearly these issues all have state and/or federal legal implications.

### 6. November 3, 2005 Complaint about 401(k)

In addition, on November 4, 2005, Karen sent Ray another email concerning the 401(k) accounts and the fact that employer match was not made to Lightship employees' accounts by a certain date. (Attachment E) Apparently Tracy sent an email to employees via "Corporate Notification" promising that CTC would correct the employer matching errors for every employee no later than November 1, 2005. Yet, three (3) days later, the

error had yet to be corrected. Karen received an email from employee Mike Hogan on this date asking for the reason for the delay. Karen alerted Ray to this "very hot issue" shortly after receiving Mike Hogan's email.

Tracy Bradstreet confirms that the company's goal was to rectify the 401(k) problem by September 1, but the company was a month late in meeting this deadline. (*Bradstreet depo., p. 145*)

After Karen lodged these complaints, the company commissioned an investigation into her conduct, as explained below.

### III.   *CTC FAILED TO CONDUCT AN APPROPRIATE INVESTIGATION INTO KAREN COOK'S COMPLAINTS*

#### A.   *Steps an Employer Should Take in Conducting an Investigation Consistent with Best Practices*

When an employee expresses a concern or lodges a complaint about workplace misconduct, an employer has an obligation to investigate. When issues such as hostile environment, retaliation, legal violations or public policy matters are the crux of the complaints, the duty is even more heightened and the employer's response more critical. Investigations should, and must in some circumstances, be conducted in a prompt and thorough manner. The duty to investigate arises from case law, governmental regulations, and by "best practices." The principles of investigating hostile environment, discrimination, and retaliation, for instance, are essentially the same. The goal is to uncover the truth, in a prompt and appropriate manner, and to determine what remedial and/or disciplinary action is necessary in the end.

At the outset of any investigation, the employer should have a basic understanding of the issues that are the subject of the investigation as well as any policies and procedures that are implicated. The following are the core steps an employer should take when investigating an employee complaint. They include selecting the appropriate investigator, planning the investigation, considering interim measures, gathering preliminary information, contacting the complaining party/alleged victim/accuser,[3] reviewing relevant materials, conducting the witness interviews, taking appropriate notes, documenting and determining remedial action, and conducting appropriate follow up with the complaining party and accused

#### *Selecting the Investigator*

An investigation into retaliation and similar complaints should be conducted by a trained, experienced and unbiased professional who is committed to discovering the truth. The investigator can be someone internal or external to the organization. In either case, the investigator must possess the necessary skills and objectivity to ensure a fair

---

[3] These terms will be used interchangeably. I will also refer to the complaining party as "she" for ease of reference.

investigation. If the investigator has not received any training on how to conduct an investigation, that would be problematic.

Investigations are complex and should/must be conducted the proper way. If the investigator makes inappropriate comments during the investigation, fails to give appropriate warnings, such as against retaliation, or omits certain assurances, such as confidentiality to the extent possible, the investigation will be compromised.

*Strategize and Plan the Investigation*

Conducting internal investigations is a delicate matter. Legal counsel should be consulted upon receipt of the complaint to ensure that the investigation is being handled, from the outset, pursuant to company policy, following all legal guidelines and regulations, and consistent with best practices. Because the stakes are so high when an employer is called to investigate claims of suspected misconduct, the utmost care must be given at all times.

Upon being notified of any possible violation of the law or internal policies, the investigator should assess the situation and prepare a strategy for conducting an investigation as promptly as possible. Such assessment shall include the level and nature of the claim(s), an evaluation of the number of persons potentially involved (as complaining party/alleged victim, accused, and any witnesses) and their positions, an identification of any documents or anything else tangible that should be reviewed, and consideration as to whether interim steps need to be taken prior to commencing witness interviews.

Based on the information received to date, the investigator should create a file and draft witness outlines. A location should be identified as to where witness interviews should be conducted, with consideration given to preserving confidentiality of all involved and ensuring that witnesses are comfortable and feel at ease to speak. The investigator should consider whether it is advisable to have a manager, supervisor, or other third party present for any or all witness interviews.

The direction of the investigation may need to be adjusted or revised as the investigation progresses. Open communication must be maintained throughout the process.

*Consider Interim Measures*

The investigative plan should commence by determining if interim steps are necessary. The purpose is to ensure that the complaining party is protected from continued exposure to inappropriate behavior and possible retaliation. Factors to be considered in determining whether interim measures are needed include, but are not limited to, the following:

19

- ♦ The expressed wishes of the complaining party;
- ♦ The nature and extent of the allegations;
- ♦ The personal safety of the complaining party;
- ♦ The number of individuals allegedly victimized;
- ♦ Whether the alleged misconduct is ongoing;
- ♦ The behavior of the individual(s) alleged to have engaged in inappropriate conduct; and
- ♦ Whether the accused has an alleged or actual history of engaging in misconduct.

If, after a review of this information, the investigator determines that interim action is advisable, the approach most often utilized will be to separate the employees. A separation can be accomplished in several different ways. This can be done by physically separating employees from working with each other or having any contact with each other. It can include temporary reassignment of one or both affected parties. The employer can place the accused employee on paid or unpaid suspension or leave of absence, pending the outcome of the investigation. If the complaining party leaves the workplace on her own volition and expresses a desire to stay away from the site until the situation can be resolved, then she should be placed on paid leave of absence pending the outcome of the investigation.

In all instances, all parties involved must be reminded of the company's presumed zero-tolerance policy against retaliation of any kind and advised to take all possible steps to avoid retaliatory conduct.

Care should be taken not to harm or penalize in any way the complaining party, so long as the complaint is believed to be made in good faith. Simultaneously, the accused's rights must be respected, and there should be no presumption whatsoever at the outset of an investigation that a policy violation has occurred.

*Gather Preliminary Information*

The investigator should receive as much information as possible about the key players who will be involved as part of the investigation. Speaking to the supervisors of the accused and accuser may be helpful as well. Initial inquiries must focus on the identities of the accused and accuser and any witnesses or others who may have knowledge of the alleged improprieties or any defenses. All witnesses who may contribute in any meaningful way to the issues under investigation should be interviewed. Background information about the professional and personal relationships, if any, should be gathered.

Also, it is important to obtain information about each person's employment status with the company, performance issues, protected status and protected categories, and the like, to fully appreciate and understand the situation. An investigator cannot operate in a vacuum, because other internal and external factors can likely have bearing on and influence the issues under investigation.

The investigator should understand what triggered the investigation. Sometimes it is a complaint directly from the employee subjected to inappropriate behavior. Sometimes it is a concern expressed by a third party on behalf of the alleged victim. Understanding and recognizing the motives for what got the process started in the first place is imperative.

*Contact the Complaining Party/Alleged Victim*

The investigator should contact the alleged victim, introduce himself or herself, and advise her that he or she will be conducting an investigation, that the complaint is being taken seriously, that misconduct in the workplace is not tolerated, and that she will be interviewed in short order. It is important to make contact with the alleged victim so that she understands that the investigative process is underway and that her complaint has been heard. Complaining parties want action to be taken, and the investigation is the first step in the action plan. Following the investigation, additional steps may be taken as well, but that depends on the outcome of the investigation.

*Review Materials*

Next, the investigator should review any documentary evidence that may exist. This includes relevant documents from the personnel files of the complaining party and accused; any notes or writings prepared about the incidents; documents, emails, offensive material or tangible evidence of any kind that may pertain to the allegations or defenses; and any written complaint of the complaining party that may exist. A review of materials may also include payroll records, time cards or time sheets, training records and related documentation, phone records, emails, and voicemails.

*Conduct Witness Interviews*

The investigator should conduct in-person interviews of all persons with knowledge of the allegations or defenses or who could otherwise provide information that would help the investigator find the facts. Interviews by telephone should be conducted, if it is impossible or a hardship to meet in person. Of course, no one, other than the investigator and witness, should be in the room when the interview is being conducted so as to ensure that the witness's account is based solely on his or her recollection and is not influenced by anyone else. The only exception is if the investigator/employer chooses to have an independent third party present for all interviews.

In conducting each witness interview, the investigator should make the following statements and representations at the outset:

- Assure the witness that the complaint is being taken seriously.

- Explain the role of the investigator.

- Advise that the company recognizes and is sensitive to the fact that it may be difficult discussing these issues.

- Express the company's commitment to compliance with the law and its own policies.

- Discuss any interim measures that have been or will be taken.

- Inform the witness that the company is committed to conducting a prompt, thorough and unbiased investigation to determine whether inappropriate action has occurred. If so, it will be stopped and appropriate corrective action, including discipline and possibly termination, will be taken.

- Explain that an investigation consists of interviewing the complaining party, alleged victim, if different, and the accused. In the event that conflicting versions of events are given, advise that it may be necessary to contact other persons who may be helpful in assessing the parties' relationship, conduct, and veracity.

- Advise that the witness is expected to provide a thorough, truthful accounting of what has occurred (who, what, when, where, why, etc.) and an identification of all evidence and individuals who may have knowledge of the incident or any defenses. Witnesses are advised to qualify answers as needed and not to guess at answers to any questions.

- Advise that no conclusions will be reached until the investigation is completed, and there is no presumption at the outset that a policy violation or illegal conduct has occurred.

- Reassure the complaining party and any witnesses that the company will tolerate no discrimination or retaliation for the filing of a good-faith complaint or for cooperating in an investigation. The investigator should explain what behavior constitutes retaliation, and should tell the witnesses to report any form of retaliatory behavior which they may experience directly to the investigator (or any other designated person).

- Advise that the investigation is to be kept as confidential as possible and that witnesses are not to discuss the investigation with anyone so as to respect the rights of all involved. Witnesses should be advised to contact the investigator and possibly a designated internal company official with questions or concerns about the investigation.

- Advise the complaining party and accused that they will be kept informed of the status of the investigation, to the extent practicable.

- Advise that the company intends to discuss the allegations on a need-to-know basis only.

- Provide an estimated timetable for the completion of the investigation and express the company's goal to complete the investigation as quickly as possible.

- Explain the note-taking process, as outlined below.

The actual content of the witness interview should necessarily vary witness to witness. The investigator needs to ascertain what the witness knows about the incidents and relationships involved. An outline of questions and issues to be discussed should be prepared in advanced, followed, and expanded upon as the interview necessitates.

Further, the investigator must examine the witness's relationship to the accused and accuser, and ascertain what motive, bias, prejudice, interest, etc., if any, that may exist and that may possibly taint that witness's testimony.

*Note Taking*

The investigator must document the investigation as it proceeds, so as to keep a chronological account of steps taken. The investigator should record the date of the witness interviews, time the interview started and ended, the location of the interview, and whether any third party was present. Other steps taken in the investigative process should be memorialized as well.

Notes of all witness interviews should be maintained. In so doing, the investigator should use quotes and write down words verbatim, to the extent possible. The investigator should advise all witnesses that he or she will be taking notes of the meeting and that he or she intends to transcribe what has been said, as fairly and accurately as possible. It is advisable that, at the end of meeting, the investigator read back the notes to the witness, make any corrections or additions that may be needed, and ask the witness to sign the notes on the last page. The witnesses should affirm in some manner that the account given is true, complete, and accurate to the best of the witness's knowledge and belief. It is my recommendation and consistent with best practices that the witnesses sign the notes. The purpose of obtaining the witness's signature is to ensure, as much as possible, that the investigator understood and properly memorialized in writing the witness's knowledge of the events described.

*Reach Conclusion, Document and Determine Remedial Action*

After completing all interviews and reviewing all available materials, the investigator should prepare several documents. First, the investigator should draft a summary of each witness interview. If the notes are legible and make sense, that may not be necessary. Second, the investigator should draft a confidential report addressed to the appropriate person in the company, which may include the following:

1)     Date complaint received;

2)     Name of person making complaint;

3)     Worksite or location of alleged incident;

4)     Name of accused and work location;

5)     A step-by-step summary of the investigative steps taken;

6)     Identification of all persons interviewed;

7)     Identification of all documents and files reviewed;

8)     Identification of all persons consulted;

9)     Manner of preservation of all tangible evidence and documents;

10)     A statement of the allegations;

11)     Factual findings and conclusions supporting each issue raised and investigated;

12)     An identity of any conflicting factual information;

13)     An analysis of factual conclusions reached after resolving any credibility issues; and

14)     Recommendations pertaining to appropriate disciplinary or corrective action, if appropriate. Such action should be administered in accordance with established company practices.

Relevant documents should be referenced and oftentimes are attached to the report as exhibits.

The purpose of a report is to allow the investigator to synthesize what is learned, analyze commonality or different versions of events, assess credibility, and objectively reach conclusions after considering what was discovered throughout the course of the investigation. The investigator must analyze and assess all available evidence and substantiate all findings made. In order to do so, the investigator must analyze the witness interviews and relevant documents, and then determine the "correct" version of the facts. If a report is not prepared, the same thought process should be taking place and the investigator should be prepared to justify his or her conclusion. It is best practices, for sure, for the investigation to be documented in a report.

Next, the company must assess what disciplinary or corrective action is needed. Remedial measures must be considered as well. Of course, any corrective action should be consistent with company policy and how others have been treated in the past. Failure to be consistent could create exposure to a claim of retaliatory or disparate treatment.

## Follow-Up with Complaining Party and Accused

Also, at the conclusion of the investigation, either company officials or the investigator should communicate with the complaining party and accused, separately, to advise that the investigation is completed and to apprise them, in general terms, of the conclusion reached. Also, to the extent possible and while respecting the rights of all involved, the complaining party, in general terms, should be advised of the remedial action taken or proposed. The complaining party should be reminded that retaliatory conduct is forbidden and will not be tolerated. She should be thanked for bringing forward any good-faith complaint and given assurances that she did the right thing.

### B.    CTC's Investigation into Karen Cook's Complaints Was Severely Deficient

An examination of the steps that the company took in the investigation here reveals that it falls short – in virtually every respect -- of the type of investigation that is expected pursuant to sound or best employment practices. Karen raised concerns. The company conducted an investigation following those concerns, but the company quickly turned the investigation into a witch-hunt against Karen. She became the alleged wrongdoer and eventually the company concluded that she, in fact, had engaged in conduct that warranted discharge.

### 1.    The Selection of Jim Prenetta as Investigator Was Inappropriate

Ray Allieri hand selected Jim Prenetta to investigate Karen Cook. *(Allieri depo., pp. 23-24)* Jim is in charge of all legal matters relating to the company, including those associated with Human Resources. *(Prenetta depo., p. 21)* However, Ray had no knowledge of Jim's experience or lack thereof in conducting investigations into employment matters. *(Allieri depo., pp. 23-24, 27)*

Jim has had absolutely no training nor has he completed any courses on state and federal employment laws. *(Prenetta depo., pp. 11-12)* For example, he enrolled in no employment law or human resources courses during law school. *(Prenetta depo., p. 8)* He worked at law firms prior to working in-house at corporations, but his private practice was focused on general corporate and securities matters. *(Prenetta depo., pp. 9-10)* At CTC and at the prior company where he worked (Viatel), Jim had responsibilities for Human Resources issues, but all of his training came only from "on-the-job training." *(Prenetta depo., pp. 9-11)*

Jim's lack of knowledge in this important area is further disturbing when reviewing additional facts. Jim has taken no continuing legal education courses in the area of

25

employment law since he graduated from law school. *(Prenetta depo., p. 14)* He maintains no employment treatises that he may refer to in his office on employment law matters. *(Prenetta depo., p. 12)* In fact, when asked at his deposition to identify the state and federal laws that that he is knowledgeable about, Jim could only name the FMLA, the ADA and HIPPA. *(Prenetta depo., p. 113)* It is interesting that he could **not** name Title VII of the Civil Rights Act of 1964, Mass General Law Chapter 151(b), NH RSA 354-A, the Age Discrimination in Employment Act, whistle-blower protection statutes, or any claims arising out of common law.

In addition to the complete void of knowledge in the employment law area, Jim was equally uneducated about the process of conducting internal investigations. Jim has had absolutely no training in how to conduct an investigation. *(Prenetta depo., p. 102)*

For this reason, the Company failed to follow best practices in conducting this internal investigation, as Jim Prenetta, despite being an attorney, was a wholly inappropriate choice to be the investigator. The many errors that he committed during the course of this investigation are fully described below. The end result of the investigation was the improper termination of Karen Cook.

### 2. The Company Failed to Strategize and Plan the Investigation

It is evident from the testimony of Jim Prenetta and the four (4) pages of notes that comprised his entire investigative file that Jim gave little thought to conducting a prompt and thorough investigation. (See Attachment G, investigative file) There is no evidence that Jim did any research into how to properly conduct an investigation of this kind prior to commencing the investigation. Jim prepared no witness outlines in advance of speaking with the witnesses. It does not appear that he considered any other process or procedure issues relating to the very important fact-finding mission that he was to undertake. It does not appear that he developed a strategy or made a proper assessment of the issues under consideration.

The company's failure in this regard is contrary to best practices on conducting investigations.

### 3. The Company Neglected to Consider Interim Measures

It is important to consider interim measures at the outside of any investigation. While it is not always appropriate and necessary to implement specific measures, every employer should give thoughtful consideration as to whether interim measures are appropriate and necessary under the circumstances. Certainly, when an employee claims retaliation, it is best practices for the employer to take some interim action to ensure that no further (alleged) retaliatory treatment takes place until the conclusion of the investigation.

Despite the fact that Karen Cook had complained to the company about Tracy Bradstreet retaliating against her and other mistreatment that she received by Tracy (as discussed in the following section, paragraph 4), the company never considered separating them,

reassigning either of them, or otherwise taking affirmative action so that they would not interact during the time the issues were under investigation. This is wrong and contrary to sound employment practices.

### 4.    The Company Failed to Gather Sufficient Preliminary Information

It is unclear from Jim Prenetta's testimony precisely what he knew about Karen's situation at the time he began his investigation into Karen Cook, but certainly the legal compliance issues go to the crux of Karen's employment – and discord -- with the company. A close analysis of Jim's deposition testimony and Ray Allieri's deposition testimony, however, reveals that Jim actually knew quite a bit about Karen's complaints before and during his investigation. Ray had asked Jim to conduct the investigation following conversations he had with Karen in which she raised issues with him concerning the Human Resources department. *(Prenetta depo., p. 81)* He wanted Jim to examine Karen's interrelationship with her peers. *(Allieri depo., p. 124)*

Additionally, and importantly, Tracy Bradstreet's complaints about Karen – and her interest in having Karen terminated -- were critical motivating factors for the investigation to be conducted. *(Prenetta depo., pp. 83, 151)*

Jim was well aware of the fact that Tracy complained about Karen, as she had complained directly to him about Karen yelling, her inability to take criticism, and other alleged abuse. *(Prenetta depo., pp. 61, 64)* Tracy also expressed that she had difficulties with Karen and that other employees had concerns about Karen as well. *(Prenetta depo., p. 69)* It is unclear how much Jim knew about Tracy's meeting with Ray complaining about Karen and expressing her desire that Karen's employment be terminated. Jim did admit, however, that he knew that Tracy explicitly told Ray, "I want to terminate Karen Cook." *(Prenetta depo., pp. 150-51)*

No other employee had lodged a complaint about Karen prior to the investigation. *(Prenetta depo., p. 150)*

Ray Allieri had already spoken to some employees in the Human Resources Department about Karen, including Clint Milhomme, but it does not appear that he and Jim spoke about what Ray learned. *(Allieri depo., p. 111)* This is a deficiency.

Jim admits that, at some point before Karen was terminated (though Jim cannot be precise on the date), he was aware of the legal concerns that Karen raised with Ray. The issues included general concerns, payroll issues, getting employees paid, and the like. *(Prenetta depo., pp. 76-77)* He was also aware of other Human Resources issues that had legal implications for the company. *(Prenetta depo., pp. 43-44)*

As for legal violations, the following is what else Jim Prenetta was aware of, though the timing of his knowledge is a bit unclear:

- During the first few months of Tracy's employment, thus in the summer-fall 2004, Tracy advised Jim that some employees were not classified correctly under the FLSA. Jim never followed up with Tracy on the issue, and he cannot recall learning any more information about it. *(Prenetta depo., pp. 33-34, 41)*

- Jim specifically knew that some employees were not properly classified as non-exempt, and they did not receive overtime pay as a result. *(Prenetta depo., p. 35)*

- An issue existed where employees were paid as consultants, but they were then re-classified and properly treated as employees and given benefits. *(Prenetta depo., p. 34)*

- Jim was also aware of problems with Form 5500's, which are filing forms for various plans that are subject to ERISA including 401(k) plans and cafeteria plans; indeed the company had paid penalties as a result of errors or omissions in connection with these filings. *(Prenetta depo., pp. 51-52, 169-70)*

- Jim knew that Karen had concerns and frustrations about payroll not always being accurate, commissions not always being paid, and exemptions the employees were taking. *(Prenetta depo., pp. 119, 195-96)*

Ray admits that Jim is the person who he would have turned to with questions about legal issues, though he recalls no specific conversations about specific issues. *(Allieri depo., pp. 61-62)* Any concerns that Karen brought to Ray about company liability or the way the company was treating employees would, in turn, be discussed between Ray and Jim. *(Allieri depo., p. 108)* Ray and Jim did, in fact, have conversations about Karen's concerns. *(Allieri depo., pp. 129-30)* Among the issues were those surrounding CTC's liability, payroll problems, and 401 (k) problems. *(Allieri depo., p. 130)*

Certainly prior to the investigation, Ray and Jim should have had an in-depth discussion about Karen's concerns.

Ray did not provide Jim with all relevant information, however. Jim denies knowing about Karen's concerns with USERRA and the FMLA, though Ray was certainly aware of the USERRA issue, for example. *(Prenetta depo., pp. 175-76; Allieri depo., pp. 67-68)* Ray further failed to provide Jim with a November 3, 2005 email that Karen wrote to him detailing various legal concerns that she had. *(Allieri depo., p. 156)*

What is critical here is that Karen Cook complained to Ray Allieri and others about multiple legal violations and policy violations that were taking place at CTC and that fell within the purview of the Human Resources Department. [4] (See Section II, A and B

---

[4] For example, in the Employee Handbook 2004, in Section 401 Timekeeping, CTC states: "Exempt and non-exempt employees are responsible for accurately recording the hours they work. This information also helps CTC to comply with federal and state laws that require it to keep accurate records to correctly calculate employee pay and benefits." Clearly, CTC recognizes the legal mandate imposed by federal and state law to pay employees correctly and on time. In the following section on Paydays, Section 402, CTC

above.) Karen further complained that Tracy Bradstreet would try to "set her up to fail," meaning retaliate against her for raising concerns. *(Allieri depo., pp. 64-66, 71-72, 113)* Karen expressed to Ray her concern that Tracy was trying to pit other employees in Human Resources against her. *(Allieri depo., p. 114)* Again, it does not appear that Ray fully informed Jim about these critical concerns.

It is not disputed that the issues Karen has raised have legal implications and that she was "genuine" in her concerns. *(Allieri depo., pp. 52-54, 95)* Further, "at no time, did [Ray] feel that there was a reason for [him] to question her credibility regarding any issues of liability." *(Allieri depo., p. 100)*

Jim Prenetta was absolutely remiss in not fully appreciating and learning about each of Karen's concerns. That is, Ray Allieri should have been the first person that Jim interviewed in this investigation, yet Jim never chose to interview Ray. *(Prenetta depo., p. 137)* Certainly, Ray could have provided Jim with *all* of the information he was aware of to date, including about Karen's fears of retaliation. Again, it is unclear from the record (as conflicting versions are offered) precisely what Jim knew. However, as senior executives having this information, it is imputed to the company, and the company was well aware that Karen had some very serious concerns about legal issues.

The company's failure in this regard is contrary to sound employment practices.

### 5. The Company Failed to Contact Karen Cook, Who Was the Complaining Party/Alleged Victim – And Eventual Alleged Wrongdoer

It is <u>unfathomable</u> that Karen Cook was not advised that the company was conducting an investigation into her behavior and relationships, which are predicated on the concerns she raised to Ray Allieri and that impacted her interactions with others. (And, significantly, the company never truly investigated the legitimate concerns that Karen raised!) As an integral player in this investigation, and one whose conduct was under scrutiny, Karen absolutely should have been contacted to provide her version of events, discuss motive or bias, defend herself, give the other side of the story, identify witnesses who could support her position, and otherwise actively participate in the process.[5] This was not fair, this was not right.

Nevertheless, Jim Prenetta failed to contact Karen and, indeed, he tried to keep the fact that an investigation was taking place a *secret* from her. *(Prenetta depo., pp. 101, 111-12)* While he could not explain why, Jim expressed that he did not think it was "appropriate" to talk to Karen because she was the subject of the investigation. *(Prenetta*

---

states that each paycheck for example and non-exempt employees "**will** include earnings for all worked performed..." (Emphasis supplied)  Certainly, paying employees pursuant to the law is not discretionary. This also applies to commission payments, where CTC states, "Commissions **are paid** on the 15[th] of each month..." (Emphasis supplied)  Again, CTC uses mandatory and not discretionary language.

[5] Had she been contacted, Karen would have denied acting inappropriately and would have had the opportunity to respond to the company's concerns.

*depo., p. 102)* He just said it was not "his experience" to speak to the person who was the subject of the investigation. *(Prenetta depo., p. 102)*

Ray Allieri specifically told Tracy not to tell Karen that the company was investigating her. *(Bradstreet depo., p. 218)*

The company's failure in this regard is contrary to sound employment practices.

> 6.   *The Company Failed to Review Relevant Materials*

Nowhere in the four (4) page investigative "file" that Jim Prenetta produced are there any documents, emails, policies or anything that Jim may have requested or reviewed as part of his investigation. Indeed, from the investigative notes and based on Jim's deposition testimony, it does not appear that he even *requested* any such materials. Certainly, Jim's investigation was far less than thorough and contrary to sound employment practices when he failed to examine documentary evidence and emails concerning Karen's complaints, Karen's interactions with others, Karen's handling of problems and the like.

> 7.   *The Witness Interviews Were Not Conducted Properly, and the Company Failed to Interview All Relevant Witnesses*

Jim Prenetta testified that he interviewed the following individuals in connection with the investigation he conducted:

- Donna Carnevale
- Tracy Bradstreet
- Jawanna Benjamin
- George Halverson
- Andrea Soo
- Dan Desmond
- Kevin Conmy
- Kirk Jonah (possibly)

*(Prenetta depo., p. 101)*

Noticeably absent from the witness list are the following important persons who had knowledge about Karen Cook:

- Ray Allieri
- Clint Milhomme
- Karen Cook

Ray Allieri and Karen Cook, for reasons already discussed, should have been interviewed in connection with this investigation.

I understand that Jim met with George Halverson and Andrea Soo *simultaneously.* *(Prenetta depo., p. 109).* An interviewer should not interview witnesses together. This is contrary to best practices.

## Clint Milhomme Should Have Been Interviewed

Clint Milhomme, a human resources professional who worked closely with Karen, absolutely should have been contacted and interviewed. Nevertheless, Jim Prenetta failed to reach out to him as part of the investigation. This is particularly odd, since Clint has the most tenure of any Human Resources person in the department, as he was hired October 18, 1999. *(Milhomme depo., pp. 7, 57, 99)* Jawanna Benjamin testified that Clint "was the only one who had history on the company." *(Benjamin depo., p. 42)* Donna Heuchling described Clint as someone who knows "the ins and outs of the company … because he had been around for a long time … he got things done." *(Heuchling depo., p. 40)*[6]

Had he been questioned, Clint would have advised Jim that he got along "very well with Karen," and said that no one ever complained about or said that Karen was abrasive or rude. *(Milhomme depo., pp. 30, 47)* While admittedly Karen and Tracy had a communication breakdown, Clint felt there was no basis at all to terminate Karen. *(Milhomme depo., pp. 52, 60)* He always observed Karen being professional and courteous to him and others. *(Milhomme depo., p. 85)* He also testified that he never heard that Jawanna Benjamin, Donna Carnevale, Andrea Soo, or George Halverson would leave the company if Karen continued to work at CTC. *(Milhomme depo., p. 86)*

When Jim was asked why he did not contact Clint, Jim explained that he suspected that Clint would be "running back to Karen directly and telling her that we were conducting an investigation on her."[7] *(Prenetta depo., pp. 111-12)* Jim believed there was enough disruption already, and he had "excellent evidence" of Clint's "inability to keep confidential information confidential within the HR department." *(Prenetta depo., p. 113)* He further stated, without explanation, that Clint would not have been an appropriate fact witness with whom he should have spoken. *(Prenetta depo., pp. 113-14)*

---

[6] Indeed, anything Donna Heuchling would ask Clint to get done, he got done. *(Heuchling depo., p. 40)*

[7] Clint believes that he may have been on vacation or paternity leave at the time of the investigation. *(Milhomme depo., p. 86)* I do not have information about whether or not Clint was on leave at the time of Jim's investigation. The facts reveal, however, that Clint would have been available by phone for the company while he was out on leave because he is "always available by phone." *(Milhomme depo., p. 93, 94)* The company maintains a listing of every employee's home number, cell phone number and work number. *(Milhomme depo., p. 94)* In fact, Clint was contacted quite a bit when he was on leave. *(Milhomme depo., p. 94)*

The company was well aware of Clint's accessibility, even if he was on a leave of absence. Indeed, Ray Allieri called Clint on November 10, 2005 to advise him of Karen's termination. *(Milhomme depo., p. 57, 58)* The following week, they met in person to discuss how the department would be running going forward. *(Milhomme depo., p. 57)*

31

A cynic might believe that Jim was not committed to discovering the truth, as Clint and Karen got along "very well." *(Milhomme depo., p. 30)*

Just because an employer believes a witness may breach confidentiality, that is absolutely no reason not to interview the person. Clearly, an employer should be discussing with each and every witness the importance of confidentiality, no retaliation, and other important principles at the inception of the witness interview. It is incumbent upon the investigator to explain the repercussions and consequences if any employee fails to abide by the employer's instructions to keep the matter strictly confidential and quiet, for example.

Even if Jim's concerns about Clint were legitimate and justified, perhaps Clint could have been someone interviewed toward the end of the investigation, rather than at the beginning. However, there is absolutely no excuse not to interview someone who has or may have key information to share.

Moreover, every employee in Human Resources should understand and appreciate the importance of confidential information. If Clint is someone who, in general, is unable to keep confidential information confidential, then he has no business working in Human Resources at CTC or in any other company. I do not have his personnel records, but certainly any shortcoming in this regard should have been documented fully and corrective action should have already been taken.

The company's action in this regard fell far short of best practices.

*The Company Failed to Thoroughly Question the Witnesses*

In speaking with the seven (7) or eight (8) witnesses that Jim Prenetta did interview in connection with the investigation, Jim asked each witness, "Can you just describe for me and explain to me, the difficulties you are having or the issues that you have with [Karen Cook]." *(Prenetta depo., p. 152)* A plain reading of this question certainly intimates that the witness was, in fact, having difficulties with Karen. That is wrong.

Notably, no evidence supports the fact that Jim discussed with each witness his role, the nature and scope of the investigation, confidentiality, no retaliation, his interest in uncovering the truth, or the like.[8] It does not appear that he asked background questions, that he inquired about the witness's relationship with Karen, the witness's knowledge of the relationship between Karen and Tracy specifically, any motive, interest or bias, the reason why Karen may have acted the way she did, or the history of problems and concerns within the department. The failure to ask comprehensive, probing and appropriate questions renders this investigation faulty, ineffective and contrary to best practices.

---

[8] Indeed, Ray Allieri admitted that he never assured Karen Cook that the company would not allow any retaliation to take place. *(Allieri depo., p. 72)*

For example, had Jim conducted a modicum of inquiry, he would have uncovered many facts to demonstrate that Karen had repeatedly complained to Tracy about legal compliance issues, that other witnesses were well aware of Karen's concerns and complaints, that Karen was frustrated by the payroll problems and systemic problems that plagued Human Resources, and the like.

Jim failed to ask questions about witnesses' relationships with each other. For instance, Jim should have learned that Jawanna Benjamin is loyal to Tracy, and vice versa. *(Benjamin depo., p. 14)*

Had he asked the right questions, Jim would have learned that Jawanna, for example, *never* felt that she would leave CTC if Karen remained employed as Human Resources Manager. *(Benjamin depo., p. 112)* Indeed, Jawanna denied that she ever said or suggested to Jim that she would resign if Karen remained employed by CTC. *(Benjamin depo., p. 112)* She also never expressed this sentiment to Tracy Bradstreet. *(Benjamin depo., p. 112)*

Further, Jawanna does not believe that anyone, other than perhaps Tracy, said or suggested that he or she would resign if Karen remained employed by the company. *(Benjamin depo., pp. 114-15)*

Jawanna Benjamin, had she been asked, would have distinguished the difference in approach between Tracy and Karen. Jawanna described Tracy as someone who "let more things slide and had the approach of hoping to get things done eventually." *(Benjamin depo., p. 71)* Karen, on the other hand, wanted everything done properly right away. *(Benjamin depo., p. 71-72)* Karen was "more of a stickler on issues." *(Benjamin depo., p. 72)*

Dan Desmond was not fully questioned either. Dan was hired as the Director of Operations and is now the Director of Repair, Transport. *(Desmond depo., p. 7)* When he was deposed, he described Karen as polite and professional. *(Desmond depo., p. 11)* He testified that he interacted with Karen sometime in September or October of 2005 in regards to a performance appraisal for an employee. *(Desmond depo., pp. 10-11)*

Dan denies that he ever complained about Karen's performance and denies that he ever lodged any kind of complaint about her. *(Desmond depo., p. 12)* He did meet with Jim Prenetta in his office, but does not recall the specifics of what they discussed. *(Desmond depo., p. 12)* Indeed, he described Karen as a "very nice woman" and said that he had no problems at all with her. *(Desmond depo., p. 12)* When asked if he suggested that Karen should be terminated, he responded, "Absolutely not." *(Desmond depo., pp. 13-14)*

Similarly, Kevin Conmy was not appropriately questioned in the investigation. In his deposition, Kevin testified that he interacted with Karen concerning two (2) employee issues. *(Conmy depo., p. 25)* Kevin raised no concerns or criticisms of Karen at any time. *(Conmy depo., p. 41)* Kevin denies raising any concerns or criticism about Karen

to anyone – and that includes Jim Prenetta -- and no one else raised concerns about Karen to him.  *(Conmy depo., p. 61)*

All of the shortcomings cited above demonstrate that the company failed to comply with best practices.

> 8.     *The Company's Note Taking Was Insufficient*

After reviewing the four (4) pages of notes and Jim Prenetta's deposition testimony, to say that Jim's note-taking was insufficient is an extreme understatement.  First, Jim cannot even state **when** the investigation began.  *(Prenetta depo., pp. 80-82, 126)*  He does not know when he met with each witness or when the investigation was concluded. *(Prenetta depo., pp. 127-28)*

None of the notes have dates, times or locations as to when or where the interviews took place.  It is unknown whether the interviews took place in person or by telephone.  The documentation is sparse and unacceptable.  Also, the notes are relatively cryptic and fail to tell any story in narrative fashion.  Jim testified that he could add very little else to what each witness told him other than what was memorialized in writing.  *(Prenetta depo., pp. 108-10, 115)*

None of the witnesses had an opportunity to sign his notes or review with Jim what he recorded.  This leads to the very real possibility that Jim did not hear, record, or fully understand what each witness said.  As is explained below with Kevin Conmy, for instance, Jim's failing in this regard may have seriously tainted this investigation and its outcome.

The failure to properly document the investigation is contrary to sound employment practices.

> 9.     *The Company Failed to Appropriately Reach a Conclusion,*
> *Document and Determine Remedial Action*

A review of Jim Prenetta's notes (as well as an analysis of his deposition testimony) reveals that Jim learned the following information about Karen Cook from the witnesses whom he interviewed:

> a.  *Tracy Bradstreet (2 ½ pages of notes)*
>
>> (1) Inability to interact with the department, which includes being sharp, rude, curt, creating an avoidance mentality, snaps, tense, abrasive, judgmental and not diplomatic;
>> (2) eTIME training, wrong information given by Karen;
>> (3) Appears that most issues are interdepartmental.  She may be creating a rift between the HR group and the employees in Bedford;
>> (4) Does not show up for staff meetings, does not come to Waltham.

His notes further state:

- Tonal issues, knows better than everyone else.
- Not solving problems but laying blame
- After NY trip, refused to travel any more.
- Given feedback by Tracy, she becomes more argumentative.
- Attacks and points fingers.
- Tracy had an office conference with her on approximately 9/16/05.
- Issues with Kevin Conmy. Accused Kevin of lying. Beginning of September.
- Tone, tone, tone.
- Fanning the fire.
- She just argues for the sake of arguing. You say "black" and she says it's "white."

b.   *Jawanna Benjamin (1/3 page of notes)*

Jim had a discussion with Jawanna, and his brief notes include references that Karen was "condescending, curt, always about whose fault…bad tone, general[ly] a bad attitude, not willing to help."

c.   *Andrea Soo and George Halverson (1/3 page of notes)*

Jim's very brief notes reflect the following:

- Won't let her finish a sentence
- Tone
- Accusatory, reactionary
- Angry
- Not helpful
- George overheard the outbursts of Karen yesterday
- Feel that they need witnesses so that things are not turned around on them.

d.   *Dan Desmond*

Jim's cryptic notes state the following: Danielle Cross conversation. Dave C. never told Danielle that she was going to have to report to Dan Desmond. Karen called out of the blue defending Danielle. "Very passionate to the employees." Dan requested Danielle's job evaluation and never got it. Failure to respond to requests. He also notes "not looking out for company's interests."

e.    *Donna Carnevale*

Jim has **no notes** pertaining to any discussion he had with Donna. *(Prenetta depo., p. 99)*

f.    *Kevin Conmy*

While Jim spoke to Kevin, he has **no notes** of it. He also has no specific recollection of talking to Kevin. *(Prenetta depo., pp. 131- 32)*

g.    *Kirk Jonah*

Jim spoke to Kirk Jonah, the branch manager in Springfield, Massachusetts, but again he has **no notes** of any such conversation. Jim then said he was not positive that he spoke with Kirk, although he has a vague recollection. *(Prenetta depo., p. 135)* In any event, Jim has absolutely no notes to memorialize this conversation or what was discussed. He "believes" that Karen was intervening with some employment matters in Springfield, including a possible kick back to family members. *(Prenetta depo., p. 136)* He has no recollection as to whether Kirk spoke favorably or unfavorably about Karen. *(Prenetta depo., pp. 136-37)*

Other than what is contained in his notes, Jim could offer very little information about what he learned from each witness. Nevertheless, he made findings following his witness interviews. Jim reached the conclusion that Karen was unable to get along and work productively with other members of the Human Resources Department and that the company would lose everyone else if Karen was not terminated. *(Prenetta depo., pp. 103, 106-07)* A review of the facts, however, reveals that Jim's conclusion lacks foundation, as discussed previously.

Certainly, Tracy Bradstreet bad-mouthed Karen and wanted her terminated. Jim Prenetta relied, in part, on Tracy's testimony in his decision to recommend Karen's termination. Tracy's testimony must be discounted for several reasons, however. The undisputed testimony is that Tracy had lost credibility with the members of the senior management team, and they could not trust her. Moreover, Tracy was angry that Karen had made complaints against her, that Karen had reported her concerns to Ray Allieri, and otherwise was questioned about the company's lack of legal compliance. For this reason, the information Tracy Bradstreet provided in her witness interview must be considered with a jaundiced eye or even discounted entirely.

A review of the testimony from other company executives confirms that Tracy's credibility was low.

36

- Jack Chidester, Senior Vice President of Sales and Service, had concerns about whether or not Tracy told him the truth, and Jim was well aware of Jack's concerns. *(Prenetta depo., pp. 85-86)*

- Jim Prenetta agreed Tracy had credibility issues. He said that it was not just about payroll, but "the way she presented a number of things to the management team and, in our view, we believe that a lot of the stuff presented by Tracy, was not with support." *(Prenetta depo., p. 171)*

- Ray Allieri confirms Jim's concerns. Tracy had essentially "lost credibility within the organization." *(Prenetta depo., p. 173, Allieri depo., pp. 81-82, 85)* Ray specifically cited an example with the 401 (k) plan where Tracy said one thing to him, but the opposite was indeed true. *(Allieri depo., pp. 83-84)* He was aware of another concern about Fidelity paperwork that made him question Tracy's truthfulness. *(Allieri depo., p. 109)*

- Kevin Conmy, Vice President of Sales, had a complaint about Tracy's conduct and integrity, and this was in regards to an employee working at the company's Philadelphia branch. *(Conmy depo., pp. 44, 49)* In late August or early September of 2005, Tracy apparently spoke to Allen Gordon, Kevin's subordinate, about an employee who is supposed to be on worker's compensation. Tracy wanted Allen to validate the fact that one of his employees was working and not actually out on worker's compensation leave. *(Conmy depo., p. 45)* When Kevin learned of Tracy's conversation with Allen, he instructed Allen not to speak further with her, and Kevin contacted Jim Prenetta as legal counsel. *(Conmy depo., p. 45)* Kevin believed that what Tracy was doing was "wrong," and "inappropriate," and he was further troubled that the company's insurance policy did not have a rider for the State of Pennsylvania.[9] *(Conmy depo., pp. 45-47, 52)* Tracy wanted the employee back to work so that she could avoid processing a worker's compensation claim. *(Conmy depo., p. 48)*

Indeed, Karen Cook also believed that Tracy was duplicitous in some of her interactions. Apparently Tracy had said in an email that Karen volunteered to assume all of the recruiting functions from Andrea Soo and would be responsible for recruiting for the Bedford office. Karen denied any such conversation took place. *(Cook depo., p. 135)* Karen was so concerned about the falsity of Tracy's statement that she contacted Ray and advised that Tracy had fabricated this conversation. *(Cook depo., pp. 135, 138, 142)*

Because of these widespread and serious concerns, the testimony from Tracy in connection with this investigation should have been given little weight. There is no evidence, however, that Jim discounted what Tracy said to him in any way.

---

[9] Tracy admitted CTC had an issue and did not have the proper worker's compensation rider in place in Pennsylvania. *(Bradstreet depo., p. 233)*

That leaves the remaining witnesses' testimony to be considered. While it is not disputed that Jim's notes indicate that Jawanna and Andrea (and it is unknown if George concurred with Andrea) expressed that Karen could be condescending, curt, angry, and not helpful, in no way does this equate to Jim's conclusion that these particular employees would leave if the company failed to terminate Karen. Indeed, as expressed in detail above, Jawanna testified that she never expressed to anyone or felt that she would leave if Karen remained employed by CTC. No employee stated that he or she may leave if Karen continued to be a CTC employee. Clint Milhomme failed to support Jim's baseless conclusion here.

Indeed, a review of the deposition testimony in this case reveals that any employee concerns about Karen were *not* dire and did not rise to the level of seriousness that Jim portrays them to be. More interesting is the fact that every employee working in the Human Resources Department at the time Karen worked there left within months of Karen's separation. See section I, B above for this analysis. And, admittedly, Karen Cook had nothing to do with their voluntary resignations. *(Prenetta depo., pp. 103-04)*

The plain facts reveal that Jim did not properly listen to, consider or probe what each witness had to offer in conducting his cursory and superficial investigation into Karen Cook's conduct. Indeed, the only mention from any witness throughout the course of this investigation, under oath, about a threat to leave is Jawanna's testimony that *Tracy's* treatment of Clint might cause Clint to leave, which was the motivation for Jawanna's complaint to Ray Allieri about Tracy. *(Benjamin depo., p. 42)* Jawanna admits that she spoke to Jim Prenetta and expressed that issues needed to be resolved, and she was displeased with Karen's communications skills. She never said or suggested, however, that Karen was creating a hostile environment. *(Benjamin depo., p. 112)* Despite Jim's conclusion that employees believe that Karen was "creating a hostile environment" *(Prenetta depo., p. 107)*, neither the notes from Jim's investigation nor the witness testimony corroborates any such allegation or statement that may have been made.

For the many reasons discussed above, the investigation was flawed and contrary to best practices.

IV. _FOLLOWING THE INVESTIGATION, CTC'S TERMINATION OF KAREN COOK WAS INAPPROPRIATE, CONTRARY TO BEST PRACTICES, AND INCONSISTENT WITH HOW OTHER CTC EMPLOYEES WERE TREATED_

Karen was terminated as a result of the findings of the investigation conducted by Jim Prenetta. Jim concluded that Karen's interaction with other employees caused the Human Resources Department to become dysfunctional and almost completely shut down.[10] *(Prenetta depo., pp. 83-84)* Jim believed the vast majority of employees were

---

[10] Clint Milhomme was well aware of a communication breakdown between Karen and Tracy. He was aware of it because he knew that Karen contacted Tracy about employee issues, and he cited a particular issue involving a New Hampshire employee. *(Milhomme depo., p. 52)* When Karen got no response from Tracy, she went to Clint to ask if Tracy had involved him in the issue because the issue needed to be addressed and Karen wanted to ensure that it got resolved. *(Milhomme depo., pp. 52-53)* Clint became

not willing to work with Karen. *(Prenetta depo., pp. 83-84)* This was the sole reason for Karen's termination. *(Prenetta depo., pp. 79, 143)* Ray Allieri, upon Jim Prenetta's advice, made the ultimate termination decision. *(Prenetta depo., pp. 79, 80, 143)*

In addition to the fact that Jim's conclusions are not supported by the testimony, as cited above, other important issues completely undermine the company's investigation. Jim certainly lacked the "definitive proof" that Ray Allieri believes is necessary before terminating an employee. *(Allieri depo., pp. 26-27)*

It is undisputed that, at some level, Jim Prenetta was aware that Karen raised legal compliance issues. *(Prenetta depo., p. 141 and citations elsewhere)* Ray Allieri certainly knew about them, as discussed more fully above. Nevertheless, Jim denied that he should have conducted a "second level investigation" to assure himself that Karen was not being terminated in retaliation for raising legal violations. *(Prenetta depo., pp. 142-43)*

Jim's testimony about not conducting a "second level investigation" is inexplicable. Jim plainly, without explanation, stated that Karen was not terminated as a result of any discussions she had about legal concerns. *(Prenetta depo., p. 143)* However, he could not adequately explain why he did not even consider in his conclusions the fact that Karen was engaging in protected activity precisely at the time of and prior to the commencement of the investigation. Nor could he explain the basis for such a bald conclusion.

Equally wrong is Ray Allieri's belief on this issue. Ray treated the so-called "personality issues" between Karen and Tracy and the legal concerns that Karen raised as "separate issues," and believed he needed to pursue them down separate paths. *(Allieri depo., p. 95)* Ray testified that he was not concerned about Karen being retaliated against for raising possible legal violations. *(Allieri depo., p. 61)*

Moreover, additional flaws are apparent. Prior to any termination, the company should have ensured that terminating Karen was consistent with the company's treatment of similarly situated employees. Further, documentation must support the termination decision. Finally, Tracy Bradstreet's motives and interest in having Karen gone should have been fully considered.

### A.   *The Company Has Consistently Considered the Protected Status and Protected Activity of Employees Prior to Terminating Their Employment*

While Jim and Ray inappropriately believe that an employee's protected status or protected activity is irrelevant, CTC's two (2) top Human Resource professionals beg to differ. That is, Tracy Bradstreet and Donna Heuchling absolutely understand the importance of considering an employee's protected status and protected activity at the

---

"the middle man." *(Milhomme depo., p. 54)* Clint believed that Karen was attempting to communicate with Tracy, *but it was Tracy* who was not being responsive. *(Milhomme depo., p. 106)*

time of a termination decision. Their understanding in this regard is consistent with best practices.

As is described more fully elsewhere, Tracy Bradstreet would not allow the company to terminate five (5) particular employees slated for layoff because they were in protected categories and there was no evidence to demonstrate they had performance issues. (*Bradstreet depo., pp. 34, 41*)

Tracy also made the recommendation that the company not terminate Sandy Crespi, the former Vice President of Human Resources, because she was "handicapped, and [Tracy] didn't see any evidence that there was anything that was, you know, clearly, kind of, gross misconduct or negligence, as Jim had suggested there might have been." (*Bradstreet depo., p. 92*) Tracy said there were clearly errors and Sandy made many mistakes, but she was not trained and she lacked "support of the function." (*Bradstreet depo., p. 92*) Due to the insufficiency of documentation to show that she was a poor performer, Tracy believed that terminating Sandy would put the company at risk. (*Bradstreet depo., p. 93-94*) For this reason, Sandy was not terminated and, instead, was transferred to an inside sales position. (*Bradstreet depo., pp. 93-94, 102-103*)

Donna Heuchling, a human resources professional with many years of experience, testified that she would absolutely explore further before authorizing a termination of an employee who had engaged in protected activity. *(Heuchling depo., pp. 80-81)* When asked how she would conduct such an inquiry, Donna explained that she would confirm that a performance-related issue was actually present. *(Heuchling depo., pp. 80-81)* She said she would look for objective evidence as part of the investigation. *(Heuchling depo., p. 81)* In addition, she would look in the employee's personnel file for documented problems prior to the time the employee engaged in protected activity. *(Heuchling depo., p. 82)* She certainly believes it is best practices to have documented performance concerns in a file, signed by an employee. *(Heuchling depo., p. 82)* She agreed that, even if a manager could articulate a performance problem, it would be unacceptable if the real reason for a termination was retaliation for engaging in protected activity and certainly there would be an obligation for the company to explore the issue further. *(Heuchling depo., p. 82)* Absent a serious infraction that had recently place, Donna would not allow a termination under these circumstances due to the protected activity in which the employee had been involved. *(Heuchling depo., p. 80)*

Even employees not in protected categories and ones who have not engaged in protected activity and who engaged in misconduct were treated less harshly than Karen. An employee named Chuck Horion, for example, received a written warning as a result of sending emails to a subordinate female employee where he invited her to go to an island with him. *(Prenetta depo., p. 153)* He also patted employees on the back and touched their shoulders. **He was also peering over urinals and staring at people.** *(Prenetta depo., pp. 176-77)*

Certainly the company has acted cautiously in making termination decisions in some instances, and documentation is important.

Here, nothing in Karen's personnel file formed the basis for the company's decision to terminate Karen's employment. *(Prenetta depo., p. 153)*

Also, the company never even considered taking action against Karen short of termination, which is contrary to its established practices. Tracy Bradstreet admits that, while employees were asked to document concerns they had about Karen's behavior, Tracy never communicated any such concerns to Karen. *(Bradstreet depo., pp. 208-09)* Even though Tracy complained that Karen did not attend meetings in Waltham, for example, she never talked to Karen about it or gave her a warning. *(Bradstreet depo., p. 165)* In fact, the company never considered putting Karen on any sort of performance improvement plan. *(Bradstreet depo., p. 209)* Tracy testified that it is CTC's general practice to put employees with performance problems on a performance improvement plan. *(Bradstreet depo., p. 102)*

> B.   *Other Employees Were Curt, Yelled, Were Abrasive, or Otherwise Were Not Always Cooperative with Co-Workers*

An examination of the facts reveals that many, many other CTC employees were known to be curt, abrasive, unprofessional – and who even yelled. While Karen was terminated for displaying such traits, other employees who did were not terminated for such misconduct. (While Tracy was terminated, it was only because the senior management team lost confidence in her and not because of the conduct described below.) No other employee had engaged in the protected activity in which Karen engaged. Jim Prenetta testified that no other employee brought matters to his attention relating to CTC's compliance with the law. *(Prenetta depo., p. 50)*

The following is a synopsis of what was learned from the deposition testimony in this case about the inappropriateness of six (6) CTC employees, including executives, who were not terminated as a result.

> 1.   *Ray Allieri*

Tracy Bradstreet testified that Ray Allieri can raise his voice, that he has raised in voice in the context of disagreements in management meetings, and that he can be intimidating and aggressive. *(Bradstreet depo., pp. 50, 105)*

Tracy cited a particular instance that troubled her, where Ray said to her, in a rather pointed and loud fashion, the following: "And why haven't you followed the guidelines?" *(Bradstreet depo., pp. 254-55)*

> 2.   *Jim Prenetta*

Tracy Bradstreet testified that Ray Allieri considered Jim Prenetta to be "abrasive" and one who "did not manage positive relationships with the other members of the Senior

Management Team." *(Bradstreet depo., p. 99)* Further, Ray Allieri described Jim as "caustic." *(Bradstreet depo., p. 99)*

Indeed, Jim had been on an executive coaching/performance counseling plan and his job was in jeopardy. *(Bradstreet depo., p. 100)* Ray was displeased with Jim's communication style because he was abrasive when he spoke with other employees. *(Bradstreet depo., p. 101)*

Tracy testified about an instance where Jim "publicly berated" her opinion, which was troublesome to her. *(Bradstreet depo., p. 104)* She found him to be "short" on occasion. She was also asked, "Were you ever aware of, you or any other employee, finding Jim to be curt?" She responded, "Yes."

        3.    *Tracy Bradstreet*

Clint Milhomme testified that he had a number of concerns about Tracy Bradstreet's interpersonal skills. He mentioned a "communication breakdown" between Tracy and the company's payroll provider, Ceridan. *(Milhomme depo., p. 24)* Former CTC employee Tina Freitas shared Clint's concerns in this regard. *(Milhomme depo., pp. 24-25)* In addition, as the company was acquiring companies, terminating plans and transferring assets, there were "multiple breakdown[s] of communication between Tracy and [CTC's] representative at Fidelity." *(Milhomme depo., p. 24)*

Clint testified that Tracy has raised her voice to him "more than a handful of times." *(Milhomme depo., p. 88)* Jawanna Benjamin confirmed that Tracy was "rude" and acted unprofessionally toward Clint. *(Benjamin depo., pp. 42-44)* Indeed, on one particular occasion, Jawanna noted Tracy's inappropriate body language and how she yelled at Clint sometime in June of 2005. *(Benjamin depo., p. 43)* Jawanna characterized Tracy as volatile. *(Benjamin depo., pp. 121-22)*

The company was well aware of concerns about Tracy's interpersonal skills, yet no documentation about this performance shortcoming is contained in Tracy's personnel file. Prior to the investigation at issue in this case, Clint expressed concerns about Tracy to both Jim Prenetta as well as Ray Allieri. *(Milhomme depo., pp. 18-20, 23; Allieri depo., pp. 91-92)* Indeed, Jawanna Benjamin also complained to company officials about Tracy, but Clint does not know the details about her complaint. *(Milhomme depo., p. 41)* Further, a male contract recruiter as well as an ADP contractor complained about Tracy. *(Milhomme depo., p. 43)*

The concerns that Clint, Jawanna and Tina raised to CTC officials were not about legal compliance but, rather, centered on Tracy's professionalism, volatility and anger toward Human Resources staff members and vendors. *(Milhomme depo., pp. 91-92; Allieri depo., p. 106)* Indeed, Clint recalled Tracy "actual[ly] yelling at our vendors and accusing them of things that were not portrayed in prior conversations." *(Milhomme depo., p. 104)* Despite these complaints, Tracy was not terminated but, rather, was given an opportunity to improve. *(Milhomme depo., p. 105)*

In addition to Clint and other Human Resources representatives complaining about Tracy, Kevin Conmy, Vice President of Sales, had concerns about Tracy. Kevin reported that Tracy yelled at him at the inception of and throughout a conversation he had with her on July 12, 2005 when he talked about engaging an outside recruiter. *(Conmy depo., pp. 41, 42)* Even after Kevin apologized, Tracy "continued to yell" at him.[11] *(Conmy depo., p. 42)* She was unprofessional. *(Conmy depo., p. 43)* Kevin raised these concerns about Tracy's behavior with his superior, Jack Chidester. *(Conmy depo., pp. 41)*

Finally, Karen also expressed to Ray Allieri that Tracy would frequently become angry and contentious, particularly when she would ask Tracy a question and Tracy did not like the answer. *(Cook depo., p. 119)* When Tracy become angry, it was obvious in her face, jaw and tone. *(Cook depo., p. 120)* On several occasions when she was angry, Tracy would raise her voice when talking to Karen. *(Cook depo., p. 129)* Karen expressed to Ray that Tracy was "abusive and contentious a lot of times" when communicating information to her. *(Cook depo., p. 132)*

### 4. Donna Carnevale

Several CTC employees were critical of Donna's interpersonal skills. Kevin Conmy described Donna Carnevale's performance as "sub-par." *(Conmy depo., p. 55)* He further describes Donna as "a little curt" and "a little rough around the edges." *(Conmy depo., p. 56)* Tracy Bradstreet confirmed that Donna Carnevale "pushed back," was "assertive," and was "direct." *(Bradstreet depo., p. 154)* Clint Milhomme described Donna as "a little over the top at times." *(Milhomme depo., p. 98)* She also came across in a "strong way" when expressing a point. *(Milhomme depo., p. 98)*

### 5. Clint Milhomme

Tracy Bradstreet described Clint's style as "very disgruntled" and "very angry." *(Bradstreet depo., p. 219)* Indeed, Clint acted in "an unprofessional manner." *(Bradstreet depo., p. 219)* Clint "refused to give [Tracy] information and withheld, you know, status reports on projects or status of things that he was working on. In some cases, he just didn't do what [Tracy] asked him to do, which caused things like FSA not to go through in a timely fashion, which caused ripples in the 401(k) program directly linked back to him not following through on instructions, second guessing what [Tracy] asked him to do and doing it his own way and it was incorrect ... he was just unprofessional." Clint would make "snide" or "arrogant remarks." *(Bradstreet depo., pp. 220-21)* He would also make inappropriate remarks to members of the management team. *(Bradstreet depo., p. 221)*

---

[11] Tracy denies raising her voice to *any* CTC employee. *(Bradstreet depo., p. 114)* In addition, Tracy denies that she ever raised her voice or spoke in an abusive tone to Karen Cook. *(Bradstreet depo., p. 114)*

6.    *Donna Heuchling*

Jawanna Benjamin described Donna as "passive aggressive" and "rude." *(Benjamin depo., pp. 17-18)* She was neither courteous nor professional. *(Benjamin depo., p. 17)* Jawanna described Donna as abusive, rude, threatening, and unprofessional. *(Benjamin depo., pp. 21, 123-24)* Indeed, Jawanna specifically advised the company that Donna was creating a "hostile workplace," and she resigned summarily "after enduring countless times of abuse where [Donna] would just freak out for no reason." *(Benjamin depo., p. 20)* A copy of Jawanna's email describing her reason for resignation is appended as Attachment H.

C.    *The Company Should Have Fully Considered Tracy Bradstreet's Motives in Recommending Karen's Termination*

Karen and Tracy met on September 20, 2005 to discuss concerns Karen had, and this was a pivotal meeting. *(Bradstreet depo., p. 172)* The only topic Tracy remembered them discussing was USERRA and Craig Smith's military leave. *(Bradstreet depo., pp. 177, 189-90)* This meeting turned into a "heated discussion," and Tracy found Karen to be offensive. Tracy admits she was "probably animated" toward Karen. *(Bradstreet depo., p. 183)* Karen then "kind've dug in her heels, and said 'This is illegal.'"[12] *(Bradstreet depo., p. 183)*

Tracy clearly did not like the fact that Karen was accusing her and the company of doing something illegal. In fact, when asked how she felt about Karen's accusation in this regard, Tracy vaguely responded, "I don't know. I don't remember." *(Bradstreet depo., p. 189)* Within a week after this "heated discussion," Tracy contacted Jim Prenetta, told him that Karen had "gone local," and expressed that she wanted Karen terminated. *(Bradstreet depo., pp. 190-93, 195)* Jim Prenetta was aware that Tracy thought Karen was taking the employee's side of issues. *(Prenetta depo., p. 72)* Tracy complained that Karen could not look at both sides of the situation, and that she always sided with the employee without ever looking at the facts and the company's views and positions. *(Prenetta depo., pp. 70-71)*

Indeed, at that September meeting, Karen explicitly told Tracy that she was going to complain to Ray Allieri about Tracy's behavior and, particularly, the legal ramifications of Craig Smith and USERRA. *(Bradstreet depo., p. 199)* Tracy felt "threatened." *(Bradstreet depo., pp. 199-200)* While Karen did not specifically say that she would report CTC to a government agency, "she was going to take action." *(Bradstreet depo., p. 211)*

Tracy recommended that Karen be terminated for a number of reasons, including, in Tracy's opinion, the fact that Karen was incapable of managing productive relationships

---

[12] Terri Radcliff, Craig's manager, was concerned about quota expectations in her department, and Craig going out on military leave again. *(Bradstreet depo., p. 178)* While there is a dispute about Craig's performance, clearly Terri Radford was frustrated and wanted Craig terminated. *(Bradstreet depo., p. 173)*

with other members of the Human Resources team and she raised problems and pointed fingers, yet was not part of the solution. (*Bradstreet depo., pp. 223-24*)

Indeed, Tracy took further action after meeting with Jim Prenetta. She tried to gather support for her mission to terminate Karen's employment. She approached other employees and asked them to put any concerns they had about Karen in writing. (*Bradstreet depo., p.* 197) Specifically, she approached Donna Carnevale and Rhonda Salvey in this regard. (*Bradstreet depo., pp. 197-98*)

### D.   The Company Should Have Considered the Source of Karen's Frustrations as the Cause of Her Interpersonal Conflicts

Karen did not have interpersonal conflict with every CTC employee. Jim Prenetta was aware that Karen always presented her concerns to Ray Allieri on an "even keel basis." *(Prenetta depo., p. 140)* Indeed, Ray had multiple meetings with Karen, and he felt they developed a nice rapport. *(Allieri depo., p. 138)* He enjoyed his conversations with her. *(Allieri depo., p. 138)* He denied that she was curt or nasty. *(Allieri depo., p. 182)* He described her as professional, very credible on the issues she raised, and "passionate" about the issues she raised.[13] *(Allieri depo., p. 100, 113)*

Similarly, Clint Milhomme spoke highly of Karen. He never witnessed Karen yelling at anyone, and he denies that she was ever rude or unprofessional to anyone. *(Milhomme depo., pp. 46-47)* Indeed, no one ever complained to Clint that Karen was abrasive or rude. *(Milhomme depo., p. 47)* Karen was always professional and courteous to him and others, based on his observations. *(Milhomme depo., p. 85)* Karen was always honest and straight-forward. *(Milhomme depo., p. 96)* Clint denies that any personality conflict existed between Karen and anyone else in Human Resources. *(Milhomme depo., p. 51)*

---

[13] Following her termination from CTC, Karen has worked at Comcast for approximately one (1) year. She collected several emails from colleagues praising her work. (See Attachment I) I make note of the following compliments as expressed to Karen by email:

- In an August 30, 2006 from Robin Higle to Karen Cook and Kerri St. Jean, Robin wrote: "Karen – what a great compliment! As I mentioned earlier, I think this is the smoothest this work & our FCC filings have ever gone! You've done such an amazing job distilling things down to what we *need* to know and weeding out all the extraneous information that always seems to be inherent to this type of work.

  CONGRATULATIONS and thank you!!

- In a September 15, 2006 email from Judith Garcea to Karen, Judith wrote, "Thank you so much, Karen. You are the best to work with!!"

- In an October 2, 2006 email from Robin Higle to Karen Cook and others, Robin states: "Excellent !!!!!!!!!!! Congratulations!!! Thank you again, Karen, for making this process so smooth and seamless. You made it look so easy when, in fact, it was more complex than usual. … now you can add Compliance to your already packed toolkit!

45

Karen was frustrated, however, and her frustrations centered around legal compliance issues. See Section II on *Factual Background* for a complete discussion about the particular concerns. More general "frustrations" are discussed below.

Tracy admitted that Karen was agitated and frustrated because Karen felt things were not getting done, things were falling through the cracks, and action had not been taken. (*Bradstreet depo., p. 141*) Indeed, Tracy admitted that Human Resources was "scrambling," and the company did not have a lot of systems in place running smoothly between CTC and Lightship. (*Bradstreet depo., p. 147*) Indeed, as far back as February and March 2005, Tracy was concerned about the shortage of employees needed to properly operate the Human Resources Department. (*Bradstreet depo., p. 62*) Tracy advocated for new hires, but CTC wanted to save money. (*Bradstreet depo., p. 62*) As a result of the company's failure to expend the necessary resources for obtaining additional employees in Human Resources, Tracy advised the company that the Human Resources function would be compromised. (*Bradstreet depo., p. 62*) This was "highly frustrating" for Tracy and "all of us." (*Bradstreet depo., p. 63*)

Indeed, Jim Prenetta admits that all employees were frustrated, stressed and pushed to their limit. *(Prenetta depo., p. 196)* He knew that Karen, in particular, was frustrated. *(Prenetta depo., pp. 195-96)* Yet he ignored the source of Karen's frustrations and, instead, focused on Karen's relationships with others in Human Resources. *(Prenetta depo., p. 196)*

Clint Milhomme verifies that Karen was not given the level of support that she needed in her role. *(Milhomme depo., p. 35)* Indeed, it is undisputed that employees were getting frustrated, and "they found it necessary to escalate upwards due to lack of response." *(Milhomme depo., p. 125)*

Jawanna Benjamin believes that Karen may have been "blindsided," meaning she does not believe that Karen knew the extent of what was going on with the acquisition. *(Benjamin depo., pp. 126-28)* Things that happened at CTC after Karen started were not in the plan, such as the eTIME and then the HR prospectus. Karen did not know she was going to be responsible for HR prospectus. *(Benjamin depo., pp. 127-28)* Karen was very employee-relations focused at her time of hire, and she wanted to do everything in the best interest of the employees. *(Benjamin depo., p. 128)*

Tracy stated, "It wasn't easy, it wasn't pleasant for any of us, and it would have been hard for any new employee to handle that office, given the tools that we were dealing with and things we were dealing with it (sic)." (*Bradstreet depo., p. 250*) Indeed, Tracy explicitly told Jim Prenetta and Ray Allieri that Human Resource's ability to deal with the merger would be "very challenging" and that Human Resources would need help. (*Bradstreet depo., pp. 147-48*)

Tracy understood that Karen was frustrated. (*Bradstreet depo., p. 157*) Tracy believed that Karen was in a "tough situation." (*Bradstreet depo., p. 161*)

In sum, Karen's frustrations centered on legal compliance. Nevertheless, when he made the termination decision, Ray Allieri testified that Jim did not discuss with him the topics that Karen was "nasty" or "high-handed" about, and he would have been interested in knowing about the topics. *(Allieri depo., p. 132)* He certainly should have been aware of the topics. Despite the fact that Jim did not explicitly discuss them, Ray certainly knew from his conversations with Karen her concern about the Human Resources Department and Tracy Bradstreet.

Ray considered Karen's failings to be personality issues with Tracy, primarily. While it is true that personality conflicts can and do exist in many workplaces, CTC should have avoided taking a superficial and narrow view of the issues. Even real "personality conflicts" can stem from a supervisor's discriminatory or retaliatory bias. Cases exist where the personality conflict itself was tainted by a supervisor's discriminatory animus and, therefore, the so-called personality conflict cannot be relied upon as a legitimate reason or motivator for an employer to take adverse employment action against an employee involved in the conflict. This is true because an employer does not have to discriminate or retaliate consciously. It is enough if it does so because of unthinking bias, such as against an employee who has complained. The bias of a supervisor certainly can cloud decisions, making it important for an employer to investigate properly and thoroughly claims of harassment and retaliation, among others, to ferret out the truth and not hide behind purported "personality conflicts."

In addition to the personality issue, CTC should have looked at what stimulated or motivated Karen to be expressive and frustrated. Had CTC examined this issue, it would have understood that it was its own non-compliant practices that fueled Karen's emotion and frustration. And, for this, CTC has to accept responsibility.

## V.   *THE FORMER VICE PRESIDENT OF HUMAN RESOURCES BELIEVES THAT THE COMPANY WISHES TO TERMINATE WHISTLE BLOWERS*

Despite the employment-at-will doctrine, which is alive and well in New Hampshire, employers must exercise caution when terminating employees. Certainly, a company is well advised to ensure that written documentation in the employee's personnel file exists to outline a performance concern, shortcoming or instances of misconduct. Certainly, the company should give employees the opportunity to correct their performance and improve. In its employee handbook, CTC maintains a progressive-discipline policy which follows this philosophy and is best practice.

When employees are in legally protected categories or have engaged in legally protected activity, employers must ensure that terminations of employees in these categories are done for legitimate non-discriminatory and non-retaliatory reasons. That is not to say that employees of color, employees over age forty (40), employees with a disability or employees who have been out on a worker's compensation leave, for example, are immune from termination. Rather, an employer should double-check and verify that the termination decision is appropriate, supported by proper documentation and not

influenced by the protected category or protected activity in which the employee is engaged.

The former Vice President of Human Resources, Tracy Bradstreet, testified under oath that she believes that CTC wanted to punish whistle-blowers and otherwise terminate employees under questionable circumstances. I note that Tracy stands to gain nothing from making such strong allegations against the company. She already received a five-figure settlement and cannot receive any more monetary gain from the company as a result of making such statements.

Tracy believed she was acting as a whistle-blower when she raised concerns about people chosen for layoff or termination, which raised legal implications. (*Bradstreet depo., p. 51*) Tracy said that she "brought information to Ray Allieri's attention that [she didn't] think he wanted to deal with." (*Bradstreet depo., p. 33*) Tracy "absolutely" believed that Ray did not want to hear the concerns that she had, and at one time he told her to "mind [her] knitting." (*Bradstreet depo., p. 51*) Part of that information was concerns Tracy made about certain individuals who had been selected for layoff or termination in light of their protected status. (*Bradstreet depo., p. 34*; Attachment J, letter from her attorney)

Tracy believed that CTC engaged in intentional retaliation and punished her for raising those concerns. (*Bradstreet depo., p. 51*) Tracy denies that Ray Allieri ever raised defects in her performance prior to her raising concerns. (*Bradstreet depo., p. 55*)

Tracy offered Pamela Hintz, former Vice President of Compliance and Regulatory Affairs, as a specific example. (*Bradstreet depo., pp. 35-37*) Tracy's concern regarding Pamela was as follows: "That if [Pamela] was recommending particular courses of action and in order to keep the company in compliance and then her name appeared on a layoff list, it would be and could be perceived that, you know, retaliation was being taken because she was a whistle-blower or because she was forcing them to be in compliance, and there could be a conclusion drawn that they were taking action because she was recommending those actions." (*Bradstreet depo., p. 37*) Tracy raised this issue with Ray, but he had "[n]o response." (*Bradstreet depo., p. 38*)

Tracy certainly believed that Pamela could be viewed as a whistle-blower. (*Bradstreet depo., p. 39*) When asked if it was her belief that Pamela was recommended for layoff because she made recommendations for the company to comply with laws and regulations, Tracy responded that Pamela "was a woman, she was outspoken, she was doing her job, she was effective, she was bringing up issues and, in some cases, those issues didn't fall well on the ears of CTC."

In September 2005, Tracy also discussed her concerns with Jim Prenetta and warned him that if action was taken against Pamela, she could have a whistle-blower case, and Jim agreed. (*Bradstreet depo., p. 40*)

Tracy explained that Ray Allieri did not want to hear about certain issues relating to "resistance to change around the business," nor did he want to hear about problems with

the way CTC was operating.[14] (*Bradstreet depo., pp. 48-49*)  When he did hear about problems or issues, in some cases, he responded by acting in an intimidating or aggressive way. (*Bradstreet depo., p. 49*)

One particular issue that was not well received by CTC was Lightship's billing practices. (*Bradstreet depo., p. 39*)  Specifically, Pamela Hintz told CTC that Lightship's billing practices may not be in compliance with the law. (*Bradstreet depo., pp. 39-40*)  Indeed, Pamela believed that Lightship or CTC was over-billing. (*Bradstreet depo., p. 55*)  Members of the senior management team, including John Pittenger the CFO and Ray Allieri, were upset that Pamela raised these issues and was particularly "vigilant" about them. (*Bradstreet depo., pp. 41-42*)

Tracy believes there is a cause and effect between her termination and Pamela's anticipated termination.  Tracy expressed that Pamela was likely on a list for termination or layoff because she raised these legal issues. (*Bradstreet depo., p. 43*)  Similarly, Tracy believes that her termination had to do with her raising these issues as well. (*Bradstreet depo., p. 43*)  Of course, it was Tracy's role to ensure or contribute to ensuring that the senior management team was aware of legal issues and ensure the organization was operating effectively and properly. (*Bradstreet depo., p. 48*)

Indeed, Tracy believes that retaliation for people expressing concerns, blowing the whistle or criticizing performance is truly a reality.  For example, Tracy had been critical of Tina Freitas' and Clint Milhomme's performance.  Subsequently, Clint and Tina complained to Ray about Tracy.  Tracy believes that the complaints that Tina and Clint lodged were ***because*** she had recently criticized their performance.[15] (*Bradstreet depo., pp. 105-06*)  The "timing" led Tracy to believe this opinion. (*Bradstreet depo., p. 106*)

Tracy's testimony here is powerful and cannot be ignored.

---

[14] Indeed, Clint Milhomme recounted an instance where Tina Freitas had complained to Ray about an issue and remarked, "It's been six (6) months since I went to Ray and nothing has been done." *(Milhomme depo., p. 29)*  Clint had a similar experience with Ray's lack of action. After he complained to Ray about Tracy's lack of professionalism, Tracy reverted back to her poor behavior and Clint did not follow up with Ray because "it was falling on deaf ears, and there would be no reason for a follow-up if nothing was done initially." *(Milhomme depo., p. 93)*

[15] Indeed, after Clint complained about Tracy to Ray, *Tracy* acted differently toward Clint. She did not exchange friendly conversation with him afterwards. *(Milhomme depo., p. 92)*  Indeed, Clint relayed one occasion where Tracy was going to meet with a vendor. She stopped to ask him whether she should "put on make up" because she did not want him and others to go to Ray and make another complaint that she was not physically presentable to the vendors. *(Milhomme depo., p. 93)*  Clint describes Tracy as being "sarcastic." *(Milhomme depo., p. 93)*

## VI.   CREDIBILITY ISSUES

Tracy Bradstreet's credibility is questionable, and the senior management failed to trust her anymore, as explained previously.

Tracy admitted that she backdated a letter for an employee named Lisa Mayo. (*Bradstreet depo., p. 242*)  Lisa had been out on FMLA leave, and the company wanted to terminate her at the expiration of that leave.  Tracy was on vacation at the time the lapse occurred, so she prepared a termination letter that was backdated by five (5) days. (*Bradstreet depo., p. 242*)  A copy of this letter is appended as Attachment B.

Donna Heuchling, the interim head of Human Resources, testified that she has never been asked to backdate a letter regarding the FMLA. *(Heuchling depo., p. 82)*  She would **not** do so, if asked, "Because you have to put the correct dates in." *(Heuchling depo., p. 83)*  She agreed that incorrectly dating such correspondence could be problematic under the law, including under the FMLA. *(Heuchling depo., p. 83)*

Other examples exist that demonstrate that the company is not honest and truthful in dealings either.  For example, it appears that CTC appeared to act in a questionable manner as well in its use of independent contractors.  Jawanna Benjamin was initially hired as a contractor. (*Bradstreet depo., p. 110*)  She was hired as a contractor and not an employee "because they really did not want head count showing up on the department." (*Bradstreet depo., p. 110*)  Tracy Bradstreet explained that CTC was trying to keep its head count down because the budget was scrutinized at the Board level. (*Bradstreet depo., p. 111*)  George Halverson was hired as a contractor as well. (*Bradstreet depo., p. 111*)  Jawanna was eventually brought on as a regular employee. (*Bradstreet depo., p. 111*)

It is interesting that the reason that CTC classified Jawanna Benjamin and George Halverson as independent contractors and not employees was **not** because of the legal test or legal requirements that differentiate the two.  Indeed, state and federal law govern the classification of workers as either "independent contractors" or "employees," and the tests do vary by governmental agency/regulation.  Nevertheless, the company seemed unconcerned with the legal issue but, rather, focused solely on head count.  Again, this is an example of the company abrogating its duty to follow the letter and spirit of the law.

Jim Prenetta testified at his deposition that he was aware of an issue where employees were paid as consultants, but they were later brought on the payroll to give them benefits and in accordance with the company's obligation to consider them employees. *(Prenetta depo., p. 34)*  Indeed, they were really employees and not contractors. *(Prenetta depo., p. 254)*

## VII.   MISCELLANEOUS ISSUES

Three remaining points are worthy of mention.

### A.   CTC Failed to Conduct any Investigation into Tracy Bradstreet's Complaints

Tracy Bradstreet, Vice President of Human Resources, believed that she was subjected to a hostile environment based on her gender. (*Bradstreet depo., pp. 23-24*) Indeed, some time before the fall of 2005, Tracy expressed her belief to Jim Prenetta, telling him that she was being treated differently than male members of the senior management team. (*Bradstreet depo., p. 26*) Tracy testified that Ray Allieri treated her differently from members of the male management team when he was unforgiving and scolded her if she came into a meeting a few minutes late, for example. (*Bradstreet depo., p. 29*) She believes that Ray had not been honest with her in some of his dealings with her, that he treated her unfairly, and that he wrongly excluded her from meetings and conversations where she should have played a role. (*Bradstreet depo., pp. 30-32*)

Indeed, by a letter sent by certified mail on March 10, 2006, Tracy, through her attorney Matthew Haymer, formally advised the company that she had been subjected to gender discrimination and unequal treatment in the terms and conditions of her employment. (Attachment J)

Indeed, when Tracy Bradstreet complained of a hostile environment and gender discrimination during her tenure with CTC, Jim Prenetta never offered to investigate her claim nor did he offer to have anyone else investigate the issue. (*Bradstreet depo., p. 26*) Also, after the company received the formal letter outlining Tracy's belief that she was subjected to inappropriate gender discrimination and harassment, no evidence exists to demonstrate that the company investigated the claim at that time either. The company certainly had a legal responsibility to investigate Tracy's claim when she raised it during her tenure with CTC, and it retained that duty to investigate when Tracy raised the issue months later as a former employee. Nevertheless, the company failed to abide by its legal duty in this regard.

### B.   Tracy's Settlement Agreement

Following Tracy Bradstreet's termination from the company, CTC and Tracy entered into a confidential negotiated Settlement Agreement and, among other things, reached agreement about Tracy's separation.[16] (Attachment K) This contract was a bargain-for exchange in which Tracy received a sum of money equal to $36,375 in exchange for a

---

[16] I understand that counsel for Karen Cook and CTC entered into a Confidentiality Agreement effective June 2, 2006. Pursuant to that contract, counsel agreed that certain information produced in the course of discovery and litigation in this matter may be designated as "confidential information" and that it may be disclosed to others, including expert witnesses, but any confidential information is only to be used in "the prosecution of" this lawsuit. Documents relating to Tracy Bradstreet's settlement are marked "confidential" and I understand this agreement applies to them.

waiver of any legal claims arising out of her employment relationship and cessation of employment with CTC. Tracy agreed to cooperate fully with CTC and its attorneys in defending or litigating any claims or charges involved CTC, which includes the Karen Cook litigation matter. She agreed not to badmouth or disparage the company (yet this provision had to be waived in order for Tracy to testify truthfully at the deposition). She knew that she was a "key witness" in Karen Cook's lawsuit against CTC, and she assumed that CTC wanted her assistance in that litigation. (*Bradstreet depo., p. 23*)

Tracy receives compensation ranging between $100 and $150 per hour for all assistance she provides at CTC's request and in connection with any litigation matters. Indeed, in bills produced, Tracy has submitted invoices to CTC totaling $8,500 for "hours worked" between September and December of 2006. (Copies of these invoices are appended hereto as Attachment L) It is unknown precisely the "work" that she has provided, but she has been paid well for it.

In entering into a negotiated Settlement Agreement, perhaps the company saw risk associated with Tracy's allegations that she was subjected to a hostile environment at CTC based on her gender and/or that she herself was a whistle-blower. *(Bradstreet depo., pp. 23-24)* Perhaps the company was motivated because it needed Tracy as a "key witness" in Karen Cook's lawsuit against CTC. *(Bradstreet depo., p. 23)* Perhaps it was simply a business decision based on those and/or other factors.

## C.    *Karen's Raising Compliance Issues Even at the Time of Her Termination*

Even on the day Karen was terminated, she continued to be professional and appropriate. After she was told that she was terminated, for example, she offered the name of a trade organization where CTC could begin to search for a replacement head of Human Resources. *(Prenetta depo., p. 192)* She suggested that the new vice president of Human Resources be more tactical in nature rather than strategic. *(Prenetta depo., pp. 192-93)* Indeed, according to Jim Prenetta's note, Karen raised the following issues, which were certainly meant to improve the organization's compliance with the law and improve employer and employee relations:

- 10 people with payroll problems
- Elizabeth Morrison didn't get direct deposit
- 401(k) problems(JP)
- One month not deposited
- Heidi Moore only got one week of pay and not two
- Unethical business practices claims
- Deduction codes not matched
- Policy handbook
- New hire package – no distinction between exempt and non-exempt
- Payroll issues
- Can't access Enterprise eTIME
- HSA not taken out
- Deduction codes not matched.  Group term life.

(Attachment M, Exhibit 2 to Prenetta deposition; *Prenetta depo., pp. 95-99, 180-193)*

This exit interview only corroborates the good-faith nature of Karen Cook's complaints and her true desire that employees be treated fairly and properly.

## VIII.   CONCLUSION

Karen joined CTC as a Human Resources Manager who was employee-oriented. She wanted to do her best. What she quickly realized is that the company was in a state of transition. The company was not abiding by best practices or legal mandates, on a state or federal level. Employees were harmed, as a result. Karen wanted the problems to be fixed, and she talked to her colleagues in Human Resources about the issues. She complained to her direct supervisor, Tracy Bradstreet. The repeated and frequent nature of the legal compliance issues caused Karen to be frustrated and strained her relationship with her co-workers, particularly Tracy.

No one doubted Karen's genuine concern for the company's and employees' best interest. No one questioned why she would be frustrated and emotional over the issues that needed to be rectified. Nevertheless, the company's *own misconduct* triggered Karen's reactions – and now Karen was being punished for reacting.

Of course, companies have policies and codes of conduct governing employee behavior in the workplace. Employees are subjected to disciplinary action up to and including termination for breaching company policies. Consideration must be given, however, to the effect that the company's own misconduct has on employees such as Karen, and the company should consider any performance management action carefully and with sensitivity. Summarily terminating employees who engage in protected activity is not a sound employment practice.

The company's investigation of Karen Cook was wholly deficient. The conclusions reached at the end of the investigation are not supported by the facts. Karen was treated differently from other employees. The company's termination of Karen was consistent with how Tracy Bradstreet said the company treated other whistle-blowers – by improperly and illegally terminating them.

Very truly yours,

Julie A. Moore, Esquire
President

Enclosures

53