UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


<u>Karen Cook</u>

     v.                           Civil Action  No. 06-cv-58-JD
                                          Opinion No. 2007 DNH 132


<u>CTC Communications Corp.</u>


<u>O R D E R</u>

In her amended complaint, Karen Cook alleges that she was wrongfully terminated by CTC Communications Corp. ("CTC") in violation of New Hampshire law (Count I), and that she was discharged in retaliation for raising concerns that CTC was not in compliance with the Uniformed Services Employment and Reemployment Rights Act ("USERRA")(Count II), the Fair Labor Standards Act ("FLSA")(Count III), and the Family and Medical Leave Act ("FMLA")(Count IV).  CTC has moved for summary judgment on all of Cook's claims.  Cook objects to summary judgment.  CTC filed a reply.

Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  On a motion for summary judgment, the moving party has the burden of showing the absence of any genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the movant does so, the court must then determine whether the non-moving party has demonstrated a triable issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  In ruling on a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor.  E.g., J.G.M.C.J. Corp. v. Sears, Roebuck & Co., 391 F.3d 364, 368 (1st Cir. 2004); Poulis-Minott v. Smith, 388 F.3d 354, 361 (1st Cir. 2004).

Background

In May 2005, CTC acquired Lightship Telecom, which resulted in the addition of more than two hundred employees.  Lightship

2

used different payroll and benefits systems causing the integration of the two companies to be slow.  To help ease the transition, CTC hired Cook as a human resources manager on July 29, 2005.

Cook was based in CTC's branch office in Bedford, New Hampshire.  She reported to the Vice President of Human Resources, Tracy Bradstreet.  Her territory included former Lightship locations throughout New England.  Cook's job responsibilities included assisting employees and managers with issues concerning benefits and compensation.  One of her duties was to ensure that CTC complied with employment laws.  Cook interacted frequently with all of the members of the CTC human resources department, including Jawanna Benjamin, who began her employment as a temporary employee before becoming a full time employee responsible for CTC payroll.

Because of the difficulties with the Lightship integration, Cook faced a myriad of issues and problems within the human resources department.  She brought many of her concerns to the attention of Bradstreet.

In August of 2005, Cook received a call from a manager in Buffalo who wanted to terminate an employee, Craig Smith, because he "had been out a couple of times . . . and he wasn't able to ramp up . . . and be able to deliver because he had . . . been

3

called out on military leave."  Cook Obj. to CTC Mot. Sum. J.

("Cook Obj."), Ex. 1, at 50.[1]  Cook told the manager that CTC

could not fire Smith because he was protected under USERRA.  The

manager responded that Bradstreet had already approved the

termination.  Cook told the manager to wait and that Cook would

speak with Bradstreet.

Cook spoke with Bradstreet, telling her that the employee

was protected under USERRA.  According to Cook, "[Bradstreet]

became very angry with me," at which point Cook told her that "we

can't go forward with this."  Id. at 51.  Bradstreet reviewed the

USERRA issue and decided that Smith was indeed protected.

Bradstreet told Cook to tell the manager to move forward in an

"appropriate way."  Id.

Cook told the manager that Smith was protected by USERRA.

The manager responded that Bradstreet already had spoken with

her, telling her that "she didn't know what she was thinking, yes

[Smith] is protected by USERRA but that she talked with outside

legal counsel and they had said that there's probably some

loopholes that we can find and if there were some performance-

related issues and . . . but that [Bradstreet] was going to dig

into that some more and get back to [the manager]."  Id. at 52.

---

[1]For all cites to the record, the court uses the exhibit
number referenced by the parties in their motion and objection.

Cook told the manager that in her opinion, there were no performance issues but that Smith's military leave had caused him "to never really be able to get the traction he needed" upon his return.  Id.  The manager agreed with Cook's assessment but was concerned about meeting quotas and "making the numbers" and asked for temporary help, which Cook told her was possible.  Id.  Smith was not terminated.

According to Cook, after her initial discussion with Bradstreet about whether to fire Smith, they discussed this employee at least two more times.  During these conversations, Bradstreet directed Cook "to fish for reasons to terminate" Smith.  Id. at 56.  Cook refused.

Bradstreet has a different recollection of the conversations concerning Smith and the reason for his possible termination.  In July of 2005, the manager from Buffalo had expressed concern to Bradstreet that Smith had performance issues prior to his military leave, and that Smith was using his leave as a shield to "avoid actions the company might take."  Cook Obj., Ex. 2, at 173.  In August, the problem was still "hanging," and Bradstreet handed it over to Cook.  Id.  After Cook spoke with the manager, Cook came to Bradstreet with a different version of events and Bradstreet was "befuddled . . . how we [could both] have such a different interpretation of what had taken place."  Id. at 173–

5

174.  Bradstreet's assessment of Smith was that he had performance issues and told Cook to go back to the manager to research this issue.  Cook became upset and said "this is breaking the law.  You can't let someone go if they're returning from military leave."  Id. at 174.  Bradstreet told Cook to go back and have another conversation with the manager to make sure Cook had all of the facts because Bradstreet had a very different understanding as to why Smith should be terminated.  Cook refused with a "defensive response" saying, "I won't support this, I'm not going to go along with this, this is illegal."  Id. at 185. Bradstreet told her, "look just go back to [the manager] and you guys work it out and come up with something that's acceptable, but make sure you've covered the ground on performance . . . and get [Smith] on a program so that he can improve his performance." Id.  According to Bradstreet, Cook and Bradstreet did not discuss Smith again.

Cook also raised concerns with Bradstreet as to whether certain employees were exempt from the requirements of FLSA.  On August 30, 2005, Cook emailed Bradstreet and asked "[a]re the Service Delivery Representatives . . . exempt or non-exempt positions?"  Cook Obj., Ex. 1 at Ex. 3 to Cook's Deposition. Bradstreet replied, "right now they are exempt.  [A]t some future point we need to complete an FLSA audit to assure ourselves they

are properly classified." Id.  Based on this email exchange,

Cook questioned whether CTC was in compliance with FLSA and

called the Department of Labor hotline for guidance.  Cook

concluded that Bradstreet's instructions were incorrect and

refused to implement Bradstreet's direction regarding the

exemption classification because "it was against the law."  Cook

Obj., Ex. 1, at 100.  According to Cook, Bradstreet was angry

with her for raising these concerns.

Cook also discussed FMLA compliance issues with Bradstreet.

In August of 2005, Cook spoke with Bradstreet about the impending

termination of an employee named Lisa Mayo.  Bradstreet told Cook

that Mayo was out on FMLA leave but had performance problems

prior to going out on leave.  Bradstreet told Cook that she

planned to backdate Mayo's termination letter to the end of

Mayo's FMLA leave.  Cook was not "comfortable with making a

termination retroactive and handling [it] that way."  Id. at 79.

Once Bradstreet decided that she wanted to fire Mayo, she told

Benjamin, who, at that time, was only a contract payroll

specialist and not a full time employee at CTC, to sign Mayo's

termination letter.  Cook "thought it was odd that a

nonrepresentative, a contractor [sic] would be asked to sign a

termination letter to an employee."  Id. at 83.  After Mayo

retained an attorney, Bradstreet told Cook that she had

instructed the managers to tell Mayo's lawyers that Mayo's replacement was a "transitional hybrid and that [CTC] didn't already replace [Mayo] and to be sure they [the managers] understood that."  Id. at 84.  Cook "listened, but . . . really didn't make comment to [Bradstreet] one way or the other."  Id. Cook believed that Bradstreet "was coaching the managers on what to say."  Id. at 85.  Cook was not asked about Mayo again.

In addition to Mayo, Cook disagreed with a manager's decision to terminate an employee named John Torkelson who was on FMLA leave.  Cook told the manager that she would not falsify reasons for Torkelson's termination.  Cook testified that she did not discuss Torkelson with any one else besides the manager. Torkelson was not terminated.

In September of 2005, Cook complained to Ray Allieri, the CEO of CTC, about Bradstreet, and at the same time, expressed concern that CTC was violating various employment laws. Specifically, in a September 21, 2005, telephone call with Allieri, Cook told Allieri that the company was being exposed to liability and that she was being "asked to do things that . . . [she] felt that [she] had a professional and ethical obligation . . . to alert him and to share that information with him."  Id. at 110.  Cook told Allieri about problems with wage and hour compliance.  When Cook was asked at her deposition to specify

8

which wage and hour compliance issues she raised with Allieri, and whether she was referring to exempt versus nonexempt classifications, Cook responded that "there were [sic] that, but then there were issues with people not receiving their overtime pay and their on-call pay." Cook Obj., Ex. 1, at 111.

At Allieri's deposition, he testified that he kept notes in his daily planner concerning the September 21, 2005, conversation with Cook. In his notes, Allieri wrote that Cook raised issues related to COBRA notices, 401K, short-term disability, and terminations. As to the terminations, his notes include a reference that Cook complained that certain terminated employees did not receive "process." Cook Obj., Ex. 6, at 50.

On September 26, 2005, Cook and Allieri met in person. Cook represents that during this meeting, they discussed many issues in the human resources department, including Cook's concern that Bradstreet's actions were violating USERRA. Specifically, Cook told Allieri that she did not feel comfortable with Bradstreet's instruction to "sneak around" to find performance issues about an employee, Craig Smith, who had been out on protected military leave. Cook Obj., Ex. 1, at 116. Cook and Allieri also discussed Bradstreet's tendency to become very angry and contentious when she did not like the answers she was given.

Allieri also kept notes from this September 26, 2005, meeting.  He wrote that Cook raised concerns related to: (1) benefit eligibility, (2) 401K, (3) her disagreement with how CTC was handling potential terminations of an employee on military leave, (4) an employee who had not been properly paid, and (5) Bradstreet's negative reactions when confronted by Cook.  Allieri also testified that "it's clear from the notes that [Cook] was being asked to, so she says . . . to dig for performance issues," and that "she was not willing to do that digging."  Cook Obj., Ex. 6, at 68–69.  Allieri also testified that Cook expressed a concern that Bradstreet would retaliate and set Cook up to fail.

On October 11, 2005, Cook called Allieri and told him that conditions were deteriorating in the Bedford office, noting problems with 401K, payroll, and benefits.  In this conversation, Cook also told Allieri that she believed she had a responsibility to notify the Department of Labor and other governmental agencies of legal violations if CTC had no intention of addressing the issues.  In November, Cook emailed Allieri twice, outlining problems with payroll, 401K, Flexible Spending Account deductions, and CTC's failure to honor wage garnishments.  In one email, Cook wrote that she was very concerned that CTC was "in violation of various regulations and was being exposed to potential liability at the hands of various governmental

10

agencies." Cook Obj., Ex. 6, at Ex. 1 to Allieri Deposition (November 3, 2005, email).

During the first few months of Cook's employment at CTC, Bradstreet questioned Cook's performance, her willingness to attend meetings away from the New Hampshire office, and her refusal to travel to CTC sites in Maine, Vermont, New Hampshire, Western Massachusetts, and New York. Bradstreet was particularly unhappy with Cook's perceived inability to work with others and her "abrasive," "rude," "negative," and "abusive" demeanor toward her co-workers. CTC Mot. Sum. J., Ex. C, at 158-161. In addition to Bradstreet, Benjamin complained about Cook. Benjamin testified that Cook once cursed and yelled at her. Benjamin also believed Cook was advocating for employees against the company. She testified that Cook was motivated by the best interests of the employees and that "it seemed like any issue frustrated her, it didn't matter how small. . . . It didn't matter what kind of problem it was, they were all . . . life-changing events." Cook Obj., Ex. 4, at 132.

In the middle of October of 2005, after a series of complaints from employees in the human resources department, and after several confrontations with Cook, Bradstreet approached Allieri and told him that Cook had "gone local," meaning "she was not representing the needs of the corporation, she was more

representing the needs of the local employees."  Cook Obj., Ex.
6, at 78.

After Bradstreet complained to Allieri about Cook, and
after Cook complained to Allieri about Bradstreet, Allieri asked
CTC's in-house counsel, James Prenetta, to investigate.  As a
result of his investigation, Prenetta recommended that Cook be
terminated because of her negative relationship with the other
employees in the human resources department.  CTC fired
Bradstreet because of her poor performance on October 27, 2005,
but this decision was not announced until November 10, 2005.  CTC
informed Cook that she was terminated on November 10, 2005.


### Discussion

Cook contends that the termination of her employment
violated the retaliation provisions of FLSA, FMLA, and USERRA and
that she was wrongfully terminated in violation of New Hampshire
law.  CTC moves for summary judgment on the ground that the
undisputed evidence does not support Cook's claims.


### A.  Retaliation under FLSA

Cook contends that CTC terminated her employment in
retaliation for issues and concerns she raised about CTC's
compliance with FLSA.  CTC asserts that Cook cannot prove her

retaliation claim because her job, as a human resources manager, required her to raise compliance issues.  CTC also asserts that Cook cannot show that her protected activity played any part in Allieri's decision to terminate her.

To prove a retaliation claim under FLSA, the plaintiff must establish "(1) [he] engaged in statutorily protected activity, (2) his employer thereafter subjected him to an adverse employment action (3) as a reprisal for having engaged in the protected activity." Blackie v. State of Maine, 75 F.3d 716, 722 (1st Cir. 1996).  When neither party asserts a mixed motive[2], "the McDonnell Douglas burden-shifting framework is used to allocate and order the burdens of producing evidence." Fennell v. First Step Designs, Ltd., 83 F.3d 526, 535 (1st Cir. 1996) (applying McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-803 (1973) burden shift to Title VII retaliation claim).[3]  "Once a

---

[2]See Desert Palace, Inc. v. Costa, 539 U.S. 90, 93 (2003)(explaining mixed motive in Title VII case).

[3]Cases decided under Title VII are instructive in deciding FLSA cases.  Serapion v. Martinez, 119 F.3d 982, 985 (1st Cir. 1997).  Other courts have used the McDonnell Douglas framework in deciding retaliation claims under FLSA.  Kanida v. Gulf Coast Med. Pers. LP, 363 F.3d 568, 577 (5th Cir. 2004); Dennett v. Anne Arundel County 213 F.3d 631, 631 (4th Cir. 2000) (per curiam); Conner v. Schnuck Markets, Inc., 121 F.3d 1390, 1394 (10th Cir. 1997); Brock v. Casey Truck Sales, Inc., 839 F.2d 872, 876 (2nd Cir. 1988); Cheng v. IDEAssociates, Inc., 2000 WL 1029219, at *5 (D.Mass July 6, 2000).

prima facie showing has been made, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for its employment decision." Fennell, 83 F.3d at 535; Bishop v. Bell Atl. Corp., 299 F.3d 53, 58 (1st Cir. 2002). If the defendant meets its burden, "the ultimate burden falls on the plaintiff to show that the proffered legitimate reason is in fact a pretext and that the job action was the result of the defendant's retaliatory animus." Id.

### 1. Protected Activity

Cook argues that she engaged in protected conduct when she: (1) informed Allieri that CTC was violating FLSA for incorrectly classifying employees and for failing to properly pay employees for overtime, (2) warned Allieri that she would notify the Department of Labor and other agencies that CTC was violating FLSA, and (3) refused to follow Bradstreet's instructions to classify all the service delivery representatives as exempt from FLSA's overtime requirements. CTC argues that it was Cook's job to raise all of these issues and for this reason, she was not protected under FLSA.

For purposes of a retaliation claim under FLSA, to engage in protected activity, the plaintiff must "step outside his or her role of representing the company and file an action adverse to

14

the employer, actively assist other employees in asserting FLSA
rights, or otherwise engage in activities that reasonably could
be perceived as directed towards the assertion of rights
protected by the FLSA."  Claudio-Gotay v. Becton Dickinson
Caribe, Ltd, 375 F.3d 99, 102 (1st Cir. 2004) (internal quotation
marks omitted).  "[T]he hallmark of protected activity under
[FLSA]" is asserting statutory rights "by taking some action
adverse to the company."  Id.  In order to be protected under
FLSA, an employee must take an action beyond mere "abstract
grumblings."  Id. at 103 (quoting Valerio v. Putnam Assocs., 173
F.3d 35, 44 (1st Cir. 1999)).  The requirement of "stepping
outside a normal role is satisfied by a showing that the employee
took some action against a . . . policy . . . and that the action
was based on a reasonable belief that the employer engaged in
. . . conduct contrary to the FLSA."  Id. at 102; EEOC v. HBE
Corp., 135 F.3d 543, 554 (8th Cir. 1998) (plaintiff protected
when he refused to follow company policy that he reasonably
believed was illegal).

Cook's threat to Allieri that she had a responsibility to
call the Department of Labor and other governmental authorities
to report FLSA violations is evidence of acting outside the scope
of her duties.  In addition, taking the facts in the light most
favorable to Cook, she has offered evidence that when she raised

15

FLSA concerns to Bradstreet, she was advocating on behalf of employees and not in furtherance of CTC's goals.  For example, Bradstreet complained that Cook had "gone local" meaning "she was not representing the needs of the corporation, she was more representing the needs of the local employees."  Cook Obj., Ex. 6, at 78.  Benjamin also believed Cook was advocating for employees against the company.

Cook also asserts that when Bradstreet directed her to classify all service delivery representatives as exempt from FLSA requirements, she was imposing a CTC policy that violated FLSA. Cook contends that when she refused to comply with that policy, she was acting outside of her job duties.  CTC contends that it did not have such a policy, and if it did, that Cook did not defy any order to classify employees as exempt because she made her own classification decisions without input from Bradstreet.

Taking the facts in the light most favorable to Cook, however, Bradstreet's email to Cook admits that some employees may have been improperly classified as FLSA exempt.  Cook contends that she refused to follow Bradstreet's instruction on classifications because she believed they violated FLSA.  As such, Cook arguably refused to follow company policy she believed was illegal, and a factual issue remains about whether Cook's activity was protected under FLSA.

16

2.  Causal Connection

CTC argues that Cook cannot establish a causal connection between her termination and protected activities under FLSA because Cook never explicitly told Allieri that she believed CTC was violating the Act.  CTC also maintains that it terminated Cook for a legitimate reason – her inability to work with others. Cook argues that she did tell Allieri about the statutory violations and that she was fired soon after, which is evidence of a causal connection.  Cook also contends CTC's stated reason for her termination was a pretext.

To prove a FLSA retaliation claim, the plaintiff must establish that she was terminated as a reprisal for having engaged in the protected activity, that is, "that a causal connection existed between the protected conduct and the adverse action."  Blackie, 75 F.3d at 722.  To establish this causal connection, the plaintiff bears the burden of proving that the protected activity was the "true reason or motive" for the termination decision.  Kearney v. Town of Wareham, 316 F.3d 18, 23 (1st Cir. 2002); see also Cheng v. IDEAssociates, Inc., 2000 WL 1029219, at *5 (D.Mass July 6, 2000).  "[T]emporal proximity of an employee's protected activity to an employer's adverse

action" provides circumstantial evidence of retaliation.  <u>Mesnick</u>
<u>v. Gen. Elec. Co.</u>, 950 F.2d 816, 828 (1st Cir. 1991); <u>see also</u>
<u>Oliver v. Digital Equip. Corp.</u>, 846 F.2d 103, 110 (1st Cir. 1988)
(discharge soon after protected conduct is strongly suggestive of
retaliation); <u>Cheng</u>, 2000 WL 1029219, at *4 ("[A] showing of
adverse action soon after an employee engages in protected
activity [under FLSA] is evidence that there is a causal
connection between the adverse action and the protected
activity.").

CTC argues that there is no causal connection here because
Cook did not tell Allieri that CTC was violating FLSA.  The
record includes evidence, however, that Cook told Allieri about
wage and hour compliance issues, including FLSA exempt versus
nonexempt classifications, and that employees were not receiving
their overtime and on-call pay.  At his deposition, Allieri
acknowledged speaking to Cook about FLSA compliance issues.
Therefore, there is evidence that supports Cook's claim that she
informed Allieri about FLSA violations.

CTC also asserts that Cook has produced no evidence that
Allieri retaliated against her for raising concerns.  Cook was
terminated, however, within a month and a half of initially
telling Allieri about various compliance issues, including FLSA
concerns, and one week after her final email to Allieri that

18

repeated her complaints.  The close temporal proximity between the protected activity and the termination is some evidence of a causal connection.

CTC contends that Cook was fired for a legitimate reason after Prenetta's investigation: her inability to work with others in the human resources department.[4]  Cook argues that CTC's stated reason for terminating her was a pretext, that Prenetta's investigation of her was inadequate, and that the investigation was used to "suggest that Cook was creating a 'hostile work environment.'"  Cook Obj. at 12.

Prenetta testified that he was asked by Allieri to investigate Cook, in part, because Bradstreet told Allieri that Cook should be fired.  Prenetta also testified that Allieri did not share all of the details as to why Bradstreet wanted Cook terminated.  Prenetta did not interview Cook and did not consult Cook's personnel file in connection with his inquiry.  In conducting his investigation, Prenetta asked witnesses one

_____

[4]In its memorandum of law in support of summary judgment, CTC suggests additional reasons for Cook's termination: her refusal to attend off-site meetings in Waltham and her refusal to visit other CTC sites away from her New Hampshire office.  CTC Mot. Summ. J. at 3.  "[A]n employer's shifting explanations for discharging an employee may themselves serve either to ground or to reinforce a finding of pretext." E.C. Waste, Inc. v. N.L.R.B., 359 F.3d 36, 44 (1st Cir. 2004).

question: "can you just describe for me, and explain to me, the difficulties that you are having or the issues that you have with [Cook.]"  Cook Obj., Ex. 5, at 152.

Prenetta testified that the employees he interviewed, including Dan Desmond and Jawanna Benjamin, complained about Cook.  As a result, he believed CTC would lose members of the human resources department if Cook remained at CTC.  Desmond testified, however, that he had no problems with Cook and that he never raised any complaints about her.  Benjamin testified that she never suggested to Prenetta that Cook was creating a hostile environment or that she would resign if Cook remained at CTC.

Taking the facts in the light most favorable to Cook, a jury question remains as to whether CTC's reason for terminating Cook was a pretext.  Cook offers evidence that Prenetta's investigation could be viewed as biased, that Bradstreet told Allieri to fire Cook after Cook raised FLSA compliance issues, and that Cook was terminated one week after raising FLSA concerns with Allieri.  The outcome of this case depends on CTC's motive and intent when it terminated Cook, "issues least suited for a determination on a motion for summary judgment."  Ruffino v. State Street Bank and Trust Co., 908 F. Supp. 1019, 1028 (D.Mass. 1995).  The record shows sufficient dispute about the reasons for Cook's termination to avoid summary judgment on Cook's claims under FLSA.

B.   USERRA

Cook contends that Allieri terminated her employment because she advocated for an employee's rights under USERRA.  CTC responds that Cook was not protected by USERRA because she was acting in her capacity as a CTC human resources manager, because CTC did not violate USERRA, and because the Act only protects those who served in the military.  CTC also argues that Cook cannot show that a USERRA issue played any part in Allieri's decision to terminate her employment.

In pertinent part, USERRA "protects anyone who assists in enforcing its provisions from employer retaliation."  Pittman v. Dep't of Justice, 486 F.3d 1276, 1284 n.2 (Fed. Cir. 2007); see 38 U.S.C. § 4311(b).  An employee's informal and internal complaints about USERRA violations may constitute enforcement of rights under the Act.  Gagnon v. Sprint Corp., 284 F.3d 839, 854–55 (8th Cir. 2002) (abrogated on other grounds by Desert Palace v. Costa, 539 U.S. 90 (2003)).  An employer's action against an employee is prohibited under USERRA if the employee's effort to enforce a protection under the Act "is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of [the] enforcement action." 38 U.S.C. § 4311(c)(2).

1. Protected Activity

CTC contends that, as in the case of FLSA, USERRA only protects activities that are taken outside of the scope of the plaintiff's employment, but acknowledges that it found no cases to support that theory.  Cook, relying on Garcetti v. Ceballos, 126 S. Ct. 1951 (2006), argues that the scope of employment limitation established in Claudio–Gotay does not apply to USERRA.

In Garcetti, however, the Supreme Court considered the First Amendment right of public employees to speak out on matters of public concern and held "that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  Id. at 1960.  As such, Garcetti does not support Cook's theory but instead suggests that complaints made within an employee's job cannot form the basis of a retaliation claim. The reasoning in Claudio–Gotay is persuasive in the context of USERRA, because it also applies in other employment retaliation contexts.  See id., 375 F.3d at 102 (citing EEOC v. HBE Corp., 135 F.3d 543, 554 (8th Cir. 1998) (Title VII case)); see also Van Portfliet v. H & R Block Mortgage Corp., 2007 WL 2773995 at *8 (M.D. Fla. Sept. 21, 2007) (Title VII); Johnson v. County of Nassau, 480 F. Supp. 2d 581, 601 (E.D.N.Y. 2007); Vidal v. Ramallo Bros. Printing, Inc., 380 F. Supp. 2d 60, 62 (D.P.R.

2005).  Therefore, to show she engaged in protected activity, Cook must produce evidence that she acted outside her role as a human resources manager when she advocated on behalf of an employee's USERRA rights.

Cook raised the issue of USERRA in the context of a branch manager's question about terminating an employee, who had been on military leave, for poor performance.  Cook told Bradstreet that the employee could not legally be terminated because of the protections afforded him under USERRA.  Cook stated that when she raised the USERRA issue, Bradstreet became very angry but later agreed that the employee was covered.  Bradstreet then directed Cook to dig for performance issues as a means of avoiding USERRA's restrictions.

Cook told Bradstreet that she believed digging for performance issues concerning an employee who had been on military leave was illegal and refused to follow Bradstreet's direction.  Cook also complained to Allieri about Bradstreet's handling of the USERRA issue.  Although CTC contends that Bradstreet followed Cook's advice, Cook presents a different version of events, which raises a factual dispute as to whether she stepped outside her role as a human resources manager, by refusing to follow Bradstreet's direction and advocating on behalf of the employee against CTC.

CTC also contends that Cook is not protected under USERRA because the Act only protects military employees.  38 U.S.C. § 4311(b)(4) states that "the prohibition in this subsection shall apply with respect to a person regardless of whether that person has performed service in the uniformed services."  Therefore, Cook's lack of military status does not affect her protection under USERRA.

CTC further argues that Cook's claim is barred because CTC did not violate USERRA.  In other employment retaliation cases, a plaintiff need not prove an underlying violation but only that she had a reasonable and good faith belief that a violation of the applicable statute occurred.  See, e.g., Benoit v. Tech. Mfg. Corp., 331 F.3d 166, 174-75 (1st Cir. 2003) (Title VII); Wright v. CompUSA, Inc., 352 F.3d 472, 477 (1st Cir. 2003); Mesnick v. Gen. Elec. Co., 950 F.2d 816, 827 (1st Cir. 1991) (ADEA).  The same rule applies here.  Therefore, lack of evidence that CTC violated USERRA does not defeat Cook's retaliation claim.

### 2. Motivating Factor

CTC argues that Cook cannot establish that she was terminated because of the USERRA issue.  To prove her claim, Cook must show that her action in support of the other employee's USERRA rights was a substantial or motivating factor in CTC's decision to terminate her.  38 U.S.C. § 4311(c)(2); see

<u>Velazquez-Garcia v. Horizon Lines Of Puerto Rico, Inc.</u>, 473 F.3d
11, 17 (1st Cir. 2007) (construing same language in §
4311(c)(1)).  If Cook makes that showing, CTC must prove, by a
preponderance of the evidence, that she would have been
terminated despite her advocacy.  <u>Id.</u>

Cook's evidence that the USERRA issue was a motivating or
substantial factor in the decision to terminate her is weak, at
best.  She relies on the temporal proximity between her complaint
to Allieri, which she asserts included a discussion of the USERRA
dispute with Bradstreet, and the decision to terminate her
employment.  She also raises suspicions about the validity of
Prenetta's investigation of the complaints about her.  Taken in
the light most favorable to her, Cook's evidence could show a
dispute as to whether her complaint about the USERRA issue was a
motivating factor.

Because CTC is both the moving party and the party with the
burden of proving that Cook would have been terminated despite
her complaint about the USERRA issue, it must carry its burden of
proof with conclusive evidence.  <u>See</u> <u>EEOC v. Union Independiente</u>
<u>de la Autoridad de Acueductos y Ancantarillados de P.R.</u>, 279 F.3d
49, 55 (1st Cir. 2002).  While the question is close, the
evidence that CTC terminated Cook for legitimate reasons, taken
in the light most favorable to her, is not sufficient to support
summary judgment.

C.  <u>FMLA</u>

Cook contends that Allieri terminated her employment because she advocated for employees' rights under FMLA.  CTC responds that Cook was not protected by FMLA because Cook never took an action that was adverse to the company and because she was acting in her capacity as a human resources manager.

CTC contends that, as in the case of FLSA and USERRA, FMLA only protects activities that are taken outside of the scope of the plaintiff's employment, but acknowledges that it found no cases to support that theory.  CTC argues that the logic underlying <u>Claudio-Gotay</u> applies to a FMLA retaliation claim and cites <u>Richmond v. Oneok, Inc.</u>, 120 F.3d 205 (10th Cir. 1997), to show that the requirements for a prima facie claim of retaliation is the same for FLSA and FMLA.  Cook contends, correctly, that <u>Oneok</u> does not address the scope of employment issue, but offers no case suggesting that <u>Claudio-Gotay</u>'s scope of employment analysis should not apply to FMLA retaliation claims.

In cases of Title VII and FLSA retaliation, the plaintiff's activity is protected only if she was acting outside the scope of her employment.  <u>Claudio-Gotay</u>, 375 F.3d 102.  The retaliation provision in FMLA is the same as in Title VII, protecting those employees who oppose any practice under each statute.  The similarity of the language used in Title VII and FMLA supports a

26

conclusion that the adverse action requirement, as used in
Claudio-Gotay, applies to a FMLA retaliation claim.

CTC argues that Cook did not take action adverse to her
employer as to FMLA because she merely questioned Bradstreet
about a potential FMLA termination, disagreed with a manager's
rationale for firing an employee named John Torkelson, and never
discussed FMLA violations with Allieri.  Cook argues that even if
FLSA's scope of employment analysis applies to FMLA, Cook was
protected because when she refused to falsify reasons for
Torkelson's termination, she stepped outside her normal role.
Cook also contends that she was protected because she opposed
Bradstreet's termination of another employee, Lisa Mayo, who was
out on FMLA leave, and because Cook raised her belief of unlawful
and unethical terminations to Allieri.

Taking the facts in the light most favorable to Cook, she
raised a concern with Bradstreet about her decision to backdate
Mayo's termination letter because Cook believed this action was
illegal.  Cook admits she never actively refused to follow
Bradstreet's instructions.  Instead, Cook "listened, but . . .
really didn't make comment to [Bradstreet] one way or the other."
Cook Obj., Ex. 1, at 85.  In addition, as to Torkelson, Cook
admitted that she only communicated with the manager and no one
else.  She never complained to Allieri about Bradstreet's
handling of the Mayo matter or about the manager's actions

27

related to Torkelson.  Cook spoke to Allieri only generally about
unlawful terminations.  Therefore, Cook cannot show that she
"stepp[ed] outside a normal role . . . by t[aking] some action
against a . . . policy" that she reasonably believed violated
FMLA.  Claudio-Gotay, 375 F.3d at 102.  Her conversations with
Bradstreet and Allieri do not rise above "abstract grumblings,"
and thus, Cook has failed as a matter of law to show that she
took action adverse to the company to support her FMLA claims.
See id. at 103.  Therefore, summary judgment is proper for Cook's
FMLA retaliation claim.

D.  Reasonable Belief

     CTC argues that Cook cannot establish her retaliation claims
because she has not demonstrated that when she raised concerns to
Allieri, she had a reasonable belief that CTC had violated the
law.  CTC contends that Cook's belief was unreasonable because
the conduct she opposed was not illegal, and as a human resources
professional, she would have known that the company had not
violated the law.

     The FLSA retaliation provision has been interpreted to
require that an employee has a reasonable belief that the
employer engaged in conduct that violated FLSA.  Claudio-Gotay,
375 F.3d at 102.  There is no case law interpreting USERRA in

this regard, but the parties have offered no argument to suggest that USERRA should be interpreted differently.

CTC argues that Cook's belief cannot be reasonable because the conduct she complained of was not illegal, which Cook should have known based on her training and expertise as a human resources manager.[5]  As evidence that her belief was unreasonable, CTC points to the fact that Cook never misclassified any employees under FLSA and was not aware that any employee did not receive required overtime.  Similarly, CTC argues that the USERRA-protected employee that Cook complained about was never fired.  Cook testified, however, that she believed that CTC was violating FLSA because employees were not getting paid overtime and because of Bradstreet's instruction to classify all service delivery representatives as FLSA exempt. Cook also testified that she believed that Bradstreet's instructions to dig for performance issues about an employee on a military leave violated USERRA.  She told Allieri about her concerns.

---

[5]CTC also argues that Cook cannot maintain a retaliation claim because the actions that Cook complains about are not required by statute.  CTC is merely restating the same argument that Cook cannot state a retaliation claim because CTC never violated the law.  As described, Cook's belief must only be reasonable and her retaliation claims can survive even if CTC's conduct that she complained about was not illegal.

Besides Cook's subjective belief, Cook has offered an email indicating that Bradstreet believed that some employees may have been improperly classified as exempt under FLSA.  Cook called the Department of Labor hotline and confirmed that Bradstreet's classification was not correct.  In addition, Bradstreet's order to dig for performance issues about an employee on military leave could be objectively construed as a pretext to justify firing a USERRA-protected employee.  Cook has raised a factual issue about whether she reasonably believed CTC was violating FLSA and USERRA.

E.   Reasonableness of Cook's Complaints

CTC argues that Cook cannot establish a statutory retaliation claim because she raised her complaints in an abusive and hostile manner.  To be protected by the retaliation provisions of FLSA and USERRA, an employee must raise complaints in a reasonable and non-disruptive fashion.  See Hochstadt v. Worcester Found. for Experimental Biology, 545 F.2d 222, 231 (1st Cir. 1976); Velez v. Jansenn Ortho LLC, 389 F. Supp. 2d  253, 260-261 (D.P.R. 2005) ("the manner in which the employee chooses to oppose an unlawful employment practice must be reasonable and not disruptive").  "Some conduct, even if in sincere opposition to unlawful employment practices under Title VII, may be so disruptive or inappropriate as to fall outside [its]

30

protections." <u>Jones v. Flagship Intern.</u>, 793 F.2d 714, 728 (5th Cir. 1986); <u>see also</u> <u>Burns v. Blackhawk Mgmt. Corp.</u>, 494 F. Supp. 2d 427, 433 (S.D.Miss. 2007)(assessing reasonableness of complaints under FLSA).

Here, there is no dispute that Cook's conversations with Allieri, at least, were civil.  There are disputed facts as to the circumstances surrounding Cook's interactions with Bradstreet.  Cook's alleged hostile relationship with her co-workers in the human resources department is irrelevant to whether Cook raised her complaints to Allieri and Bradstreet in a reasonable fashion.  <u>See</u> <u>Hochstadt</u>, 545 F.2d at 231; <u>Velez</u>, 389 F. Supp. 2d at 260-261.

F.   <u>Wrongful Termination</u>

In order to prevail on a wrongful termination claim under New Hampshire law, a plaintiff must establish two elements: one, "that the employer terminated the employment out of bad faith, malice, or retaliation; and two, that . . . the employment [was terminated] because the employee performed acts which public policy would encourage or . . . refused to perform acts which public policy would condemn."  <u>Lacassse v. Spaulding Youth Ctr.</u>, 154 N.H. 246, 248 (2006).

CTC argues that Cook cannot establish the public policy element of her wrongful termination claim because: (1) it was

part of Cook's job responsibilities to bring employment-related
concerns to Bradstreet and Allieri; (2) Cook merely disagreed
with the internal policies set by her supervisor; and (3) the
public policies that Cook relies on to support her wrongful
termination claim have statutory remedies and thus are preempted
by federal statutes.  In addition, CTC argues that Cook cannot
show a causal connection between her protected activity and her
termination.

### 1.  Public Policy

Public policy for purposes of a wrongful discharge claim may
be based on statutory or non-statutory policies.  <u>Cilley v. N.H.
Ball Bearings, Inc.</u>, 128 N.H. 401, 406 (1986).  A plaintiff may
not, however, rely on a statutory policy if the legislature
clearly intended to replace the common law remedy of wrongful
discharge with a statutory remedy.  <u>Wenners v. Great St.
Beverages, Inc.</u>, 140 N.H. 100, 103 (1995).  Whether an employee's
actions were protected by public policy is a factual issue.
<u>Cloutier v. Great Alt. & Pac. Tea Co., Inc.</u>, 121 N.H. 915, 924
(1981).

### a. Part of her job.

CTC contends that an employee who is cooperating with her
employer and doing her job is not engaging in activities that

public policy would encourage because such actions are merely routine.  Instead, CTC argues, Cook must show that she was engaging in activities that were intended to be for the public good, were against her employer's wishes, and revealed previously unknown issues.  CTC acknowledges that it has found no New Hampshire cases that require a plaintiff to show that her actions were taken outside of the scope of her employment but urges that theory nevertheless.

New Hampshire cases suggest that a wrongful discharge claim need not be based on actions taken outside the scope of employment.  In Short v. Sch. Admin. Unit No. 16, 136 N.H. 76, 85 (1992), the plaintiff asserted that he was fired for refusing to publicly criticize his supervisor.  Without indicating that activities supported by public policy must be outside of the plaintiff's scope of employment, the New Hampshire Supreme Court held only that public policy does not support loyalty to a supervisor that contravenes loyalty to the employer.  Id.  In Cloutier, the plaintiff, the manager of an A&P, claimed that he was fired because he refused to have his assistant manager deliver cash from the grocery store to the bank without police protection, which was necessary for his safety.  121 N.H. at 923. The court held that his action was one that public policy would encourage, although it was part of his job.  Id.

33

In addition, Cook does not base her wrongful discharge claim on "disclosures" of unknown problems as in <u>Daly v. Univ. of N.H.,</u> 2001 WL 1326585 (D.N.H. Sept. 19, 2001), which CTC cites. Instead, Cook asserts that she was discharged because she opposed certain practices in the human resources department which she believed violated federal laws and because she threatened to report violations to the Department of Labor and other agencies. Cook notes that Bradstreet thought she was advocating for the rights of individual employees instead of promoting CTC's interests. As such, Cook has raised a factual issue about whether she was terminated because she engaged in an activity that public policy would encourage.

### b.   Internal not public policy.

CTC also contends that Cook's complaints about Bradstreet were aimed at internal policies not public policy. CTC relies on <u>Bourque v. Town of Bow</u>, 736 F. Supp. 398, 402–03 (D.N.H. 1990), which held that an employee's complaints against his supervisor raised a managerial issue, not a matter of public policy. In this case, however, Cook contends she was terminated for raising issues and concerns about actions that she believed violated federal laws, not because she complained about Bradstreet's management. <u>Cf.</u> <u>Short</u>, 136 N.H. at 86 ("[A]n employee's expression of disagreement with a management decision is not an

34

act protected by public policy.").  A factual issue remains as to
the reasons for Cook's termination.

### c.  Statutory remedy.

CTC argues that Cook's wrongful discharge claim is preempted
by remedies available under Massachusetts General Laws chapters
148 and 149, the Employee Retirement and Income Security Act, the
FLSA, the FMLA, and the USERRA.  CTC provides no developed
preemption analysis to support that theory, which is required to
successfully show that a wrongful discharge claim is barred by
another remedy.  Scannell v. Sears Roebuck & Co., 2006 WL 2570601
at *3 (D.N.H. Sept. 6, 2006) (citing Bliss v. Stow Mills, Inc.,
146 N.H. 550, 553-54 (2001)).  Therefore, that defense is deemed
to be waived.  United States v. Zannino, 895 F.2d 1, 17 (1st Cir.
1990).

### 2.  Retaliation

CTC also contends that Cook cannot prove that she was
terminated in retaliation for protected conduct.  As is more
fully discussed in the context of Cook's federal claims, factual
issues remain as to whether CTC terminated her because of the
issues and concerns she raised or because she could not get along
with her fellow employees.

<u>Conclusion</u>

For the foregoing reasons, the defendant's motion for summary judgment (doc. no. 47) is granted as to the plaintiff's claim of retaliation under the FMLA (Count IV) and is otherwise denied.  In light of this ruling, counsel and the parties should step back, make an objective evaluation of their cases, and undertake good faith efforts to resolve this matter by agreement before additional resources are expended on a lengthy trial.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
United States District Judge

October 30, 2007

cc:   Heather M. Burns, Esquire
      Samantha C. Halem, Esquire
      Lauren S. Irwin, Esquire
      Mary L. Marshall, Esquire